UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION


UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff          )
                                   )  NO. 1:11-CR- 11-TWP-KPF
        -vs-                       )  Indianapolis, Indiana
                                   )  May 23, 2011
SAMUEL T. HENZEL,                  )
                                   )
                Defendant.         )

                        Before the

            Honorable Tanya Walton Pratt

       TRANSCRIPT OF DEFENDANT'S PLEA AND SENTENCING


APPEARANCES:

For the Government:      Office of the United States Attorney
                         A. Brant Cook, AUSA
                         10 West Market Street, Suite 2100
                         Indianapolis, IN  46204


For the Defendant:       Crawford & Devane
                         By:  Jack Crawford
                         1050 N. College Ave.
                         Indianapolis, IN  46202


Court Reporter:          Frederick C. Pratt, CSR
                         290 U.S. Courthouse
                         Indianapolis, IN  46204



            PROCEEDINGS TAKEN BY MACHINE SHORTHAND
               COMPUTER-AIDED TRANSCRIPTION

I N D E X

| WITNESSES FOR THE GOVERNMENT: | DX | CX |
|---|---|---|
| **JANE DOE** | 21 | |
| **JOHN PIRICS** | 68 | |
| **JOHN DOE** | 91 | |

1                    (IN OPEN COURT.)

2          THE COURT:  Good morning everyone.  We are on the

3    record.  This is the United States of America versus Samuel T.

4    Henzel.  And our cause number is 1:11-cr-11-1.

5          Counsel, would you each state your names for the

6    record and indicate who you represent, beginning with the

7    government?

8          MR. COOK:  Your Honor, Brant Cook.  I represent the

9    United States of America.  With me is Task Force Officer John

10   Pirics.

11         THE COURT:  Thank you.  And at our defense able?

12         MR. CRAWFORD:  Attorney Jack Crawford, Judge, court

13   appointed under the Criminal Justice Act to represent the

14   defendant Samuel T. Henzel.

15         THE COURT:  For the record, also present are

16   Michelle Fitzgerald from the United States Probation Office,

17   and our court reporter today is Fred Pratt.

18         Mr. Crawford, it's my understanding your client Samuel

19   T. Henzel wishes to plead guilty to Count 1 of the information

20   and the parties also wish to proceed today with the sentencing

21   hearing.

22         MR. CRAWFORD:  That's correct.

23         THE COURT:  Mr. Crawford, would you and Mr. Henzel

24   please come to the lectern?

25         While they're doing that, Mr. Cook, are there any

1  identifiable victims for the offense?

2          MR. COOK:  There is, Your Honor.  For purposes of

3  this hearing I'll refer to her as Jane Doe, 12 year old minor,

4  with her parents.

5          THE COURT:  Does she wish to be heard?  Or any of

6  the victim's family wish to be heard today?

7          MR. COOK:  Yes, Your Honor.

8          THE COURT:  Mr. Henzel, you have previously filed a

9  petition to enter a plea of guilty.

10         Sir, do you wish to go forward with that hearing

11 today?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  And my understanding is that no plea

14 agreement has been filed and he's going to plead guilty

15 without benefit of a plea agreement; is that correct,

16 Mr. Crawford?

17         MR. CRAWFORD:  That's correct, Your Honor.

18         THE COURT:  Mr. Henzel, at this time I'm going to

19 place you under oath to make sure you are making a voluntary

20 decision to plead guilty.

21         SAMUEL T. HENZEL, DEFENDANT'S WITNESS, SWORN

22         THE COURT:  You may put your hand down.

23         Mr. Henzel, could you please state your full name for

24 the record?

25         THE DEFENDANT:  Samuel T. Henzel.

1          THE COURT:  How old are you, sir?

2          THE DEFENDANT:  I'm 29.

3          THE COURT:  How far did you go in school?

4          THE DEFENDANT:  I have a high school diploma.

5          THE COURT:  You have no problem reading and writing

6    the English language?

7          THE DEFENDANT:  Correct.

8          THE COURT:  Sir, have you ever been treated for

9    mental illness, alcohol, or addiction to narcotics of any

10   kind?

11         THE DEFENDANT:  No, Your Honor.

12         THE COURT:  Are you currently under the influence of

13   any drug, medication or alcoholic beverage of any kind?

14         THE DEFENDANT:  No, Your Honor.

15         THE COURT:  Do you believe you have a clear

16   understanding of today's proceedings; clear head today?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  Sir, have you received a copy of the

19   information that's pending against you, the charging

20   information?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  Have you fully discussed those charges

23   and this case in general with Mr. Crawford as your counsel?

24         MR. CRAWFORD:  Yes.

25         THE COURT:  Now, Mr. Crawford's your new attorney.

1  You've had two other attorneys.  And during the process of

2  this case, have you been able to discuss the charges and

3  possible defense with your other attorneys also?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  Okay.  Mr. Henzel, I need to make sure

6  you understand the penalties you face on this charge.

7         Do you understand that you've been charged with one

8  count of travel with intent to engage in illicit sexual

9  conduct, in violation of Federal Statute 18 U.S. Code 2423(b)?

10         Do you understand the charges?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  Do you understand this is a very serious

13  felony, Class B felony, and under the statutory provisions it

14  can carry up to 30 years imprisonment and a fine of up to

15  $250,000?

16         Do you understand?

17              THE DEFENDANT:  Yes, Your Honor.

18              THE COURT:  Do you understand any prison sentence

19  for this charge will be followed by what's called supervised

20  release?

21              THE DEFENDANT:  Yes.

22              THE COURT:  And do you understand, under supervised

23  release, you would be subject to supervision by a federal

24  probation officer; you would have to comply with a number of

25  conditions; you would have to stay out of trouble with the

law; and, if you got a new arrest, or new conviction, or violated some of the conditions of your release, you could wind up going back in prison on the exact same charge, the same case?

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that for this offense supervised release could be anywhere from five years up to life?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that, in addition to being find up to $250,000, you could be ordered to pay restitution to any known victims?

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And also, you will have to pay a special assessment of $100; do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Mr. Cook, are there any penalties that the Court failed to mention on this charge?

MR. COOK: I believe you noted all the penalties, Your Honor.

THE COURT: Thank you. Mr. Henzel, are you fully satisfied with the counsel, representation and advice given to you in this case by your attorney Mr. Crawford?

1            THE DEFENDANT:  Yes, Your Honor.

2            THE COURT:  He is one of the best criminal defense

3   attorneys in the State of Indiana because I know him from

4   state court also.  You have a very good lawyer.

5        Have you talked with Mr. Crawford about the

6   government's evidence?

7            THE DEFENDANT:  Uhmm, yes, Your Honor.

8            THE COURT:  And about ways in which you might defend

9   yourself?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  And are you making an intelligent

12  decision today to proceed with your plea agreement?

13           THE DEFENDANT:  Yes, Your Honor.

14           THE COURT:  All right.  Now, Mr. Henzel, your plea

15  is without the benefit of an agreement with the government.

16  But has anyone made any threats or used any force to persuade

17  you to accept a plea agreement?

18           THE DEFENDANT:  No, Your Honor.

19           THE COURT:  Has anyone made any promises or

20  assurances of any kind to get you to plead guilty?

21           THE DEFENDANT:  No, Your Honor.

22           THE COURT:  Has anyone -- I'm sorry, are you

23  pleading guilty of your own free will and because you are in

24  fact guilty?

25           THE DEFENDANT:  Yes, Your Honor.

1        THE COURT:  All right.  Mr. Henzel, again the
2  offense to which you are pleading guilty is a felony offense.
3  And do you understand that, if the Court accepts your plea,
4  you will be adjudged guilty of that offense and this
5  adjudication may deprive you of valuable civil rights, such as
6  your right to vote, right to hold public office, right to
7  serve on a jury, and right to possess a firearm of any kind?
8        Do you understand that?
9        THE DEFENDANT:  Yes, Your Honor.
10        THE COURT:  Knowing all of these factors, do you
11  still wish to enter a plea of guilty?
12        THE DEFENDANT:  Yes, Your Honor.
13        THE COURT:  Sir, do you understand you have a right
14  to plead guilty or not guilty to any offense charged against
15  you and to maintain that plea?  But when you plead guilty you
16  give up certain rights.
17        THE DEFENDANT:  Yes, Your Honor.
18        THE COURT:  You do have a right to a trial by jury.
19  Do you understand by pleading guilty you're giving up that
20  right?  There will be no trial; do you understand?
21        THE DEFENDANT:  Yes, I do.
22        THE COURT:  At trial, you have the right to plead
23  your innocence and the government would have to prove your
24  guilt beyond a reasonable doubt.  But when you plead guilty
25  you give up that right; do you understand?

1          THE DEFENDANT:  Yes.

2          THE COURT:  You have the right to the assistance of

3  an attorney at all stages of the proceedings, and have that

4  attorney furnished to you by the Court at trial and other

5  stages of the proceedings, if you couldn't afford to hire your

6  own counsel; do you understand that?

7          THE DEFENDANT:  Yes.

8          THE COURT:  At a trial you have a right to see and

9  hear all witnesses against you; to have them cross-examined by

10 your defense attorney; a right on your own part to decline to

11 testify, or unless you voluntarily elected to do so in your

12 own defense; and a right to compel the attendance of witnesses

13 to testify or provide evidence in your defense.  But when you

14 plead guilty, you're giving up all of those rights; do you

15 understand?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  Do you understand, sir, that should you

18 decide not to testify at a trial, or put on any evidence

19 whatsoever at a trial, these facts could not be used against

20 you and the jury would be so instructed?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  And do you further understand by

23 entering a plea of guilty that, if this plea is accepted by

24 the Court, there will be no trial and you will have waived all

25 the rights that are associated with the trial as I've just

1 described them to you; do you understand?

2 　　　　　THE DEFENDANT:  Yes, Your Honor.

3 　　　　　THE COURT:  All right.  Mr. Henzel, you've agreed to

4 plead guilty to Count 1, travel with intent to engage in

5 illicit sexual conduct, in violation of Title 18 U.S. Code

6 2423(b).

7 　　　Do you understand that the determination of your

8 sentence will be solely within the discretion of the Court;

9 understand?

10 　　　　　THE DEFENDANT:  Yes, Your Honor.

11 　　　　　THE COURT:  The government will be asking for a

12 sentence within the advisory guideline range, but you're free

13 to ask for a lesser sentence; do you understand?

14 　　　　　THE DEFENDANT:  Yes, Your Honor.

15 　　　　　THE COURT:  The government will probably also ask

16 for a life term of supervised release, but you're free to ask

17 for less, anywhere from five years up to life; do you

18 understand?

19 　　　　　THE DEFENDANT:  Yes, Your Honor.

20 　　　　　THE COURT:  Do you understand the Court may sentence

21 you within the statutory perimeters and will consider the

22 Sentencing Guidelines in an advisory capacity in determining

23 the appropriate sentence?

24 　　　Do you understand that?

25 　　　　　THE DEFENDANT:  Yes, Your Honor.

1    THE COURT:  Do you understand the Court determines

2  the advisory guideline range for your case after consulting

3  with the presentence report and the reported facts, and the

4  application of the guidelines recommended by both the

5  probation officer and the government and your counsel, and

6  based upon what I will hear in court today; do you understand?

7    THE DEFENDANT:  Yes, Your Honor.

8    THE COURT:  Do you understand that the sentence

9  ultimately imposed may be different from your -- the estimate

10  that your attorney may have given to you?

11    THE DEFENDANT:  Yes, Your Honor.

12    THE COURT:  Do you understand after your initial

13  advisory guideline range has been determined, the Court has

14  the authority in some circumstances to depart either upward or

15  downward from that range?  And the Court will examine other

16  statutory sentencing factors that are set forth in United

17  States Code Section 3553(a).  And those are considerations --

18  different considerations that may result in the imposition of

19  a sentence that is either greater or lesser than the

20  guideline -- advisory guidelines; do you understand?

21    THE DEFENDANT:  Yes, Your Honor.

22    THE COURT:  Sir, do you understand that parole has

23  been abolished?  And if you're sentenced to prison you will

24  not be placed on parole, but instead placed on supervised

25  release?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Do you understand that since you're
3  pleading guilty without a plea agreement you are free, of
4  course, to argue any sentence you believe is appropriate
5  within the sentencing guideline range for travel with intent
6  to engage in illicit sexual conduct, in violation of Title 18
7  U.S. Code Section 2423(a)(2)?  And you do you understand that
8  that offense can carry up to 30 years in prison?

9          Do you understand that?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  All right.  With respect to the -- do
12  you understand that I will have to make the final decision on
13  the sentence?

14          Do you understand that, sir?

15          THE DEFENDANT:  Yes, Your Honor.

16          THE COURT:  All right.  And the Court's going to
17  also take into consideration any facts or circumstances that
18  might be brought to my attention at today's sentencing
19  hearing; do you understand that?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  Do you understand you have a statutory
22  right to appeal the conviction and sentence imposed, including
23  the manner in which the sentence will be determined today?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Mr. Henzel, I need to make sure you

1  understand what the government would need to prove beyond a

2  reasonable doubt if this case went to trial.

3       The government would have to prove beyond a reasonable

4  doubt that on or about October 30th, 2010, in Hamilton

5  County, Indiana, which is located in the Southern District of

6  Indiana, that you traveled in interstate commerce for the

7  purpose of engaging in illicit sexual conduct with another

8  person, to wit:  You traveled from Oak Park, Illinois, to

9  Westfield, Indiana, for the purpose of engaging in illicit

10 sexual conduct with Jane Doe, when you knew that Jane Doe was

11 a minor female who was under –– who was 12 years old.

12       Do you understand what they would have to prove?

13            THE DEFENDANT:  Yes, Your Honor.

14            THE COURT:  All right.  At this time we need to

15 establish a factual basis.

16       And is the government going to present anything or are

17 the parties going to rely on their stipulation?

18            MR. COOK:  Your Honor, I have nothing further to

19 present with regard this portion of the hearing and the

20 government would rest on the stipulated factual basis.

21       If I could make one note quickly, Your Honor?

22            THE COURT:  You may.

23            MR. COOK:  As the Court went through Mr. Henzel's

24 rights ––

25            THE COURT:  I'm sorry, I can barely hear you.  Will

1  you come up to the podium?

2      Mr. Henzel, step over there.  Mr. Crawford, you go
3  over there with Mr. Henzel.

4      MR. COOK:  I apologize, Your Honor.  I'll briefly
5  note, as the Court went through Mr. Henzel's rights, the
6  normal case of course is that most defendants enter into a
7  plea agreement.  Mr. Henzel has chosen not to do so, as is his
8  right.  Normally in a plea agreement the government would ask
9  for an advisory guideline sentence, and the Court's noted that
10  in the normal course of business here.  However, without the
11  benefit of a plea agreement the government is not bound to ask
12  for an advisory guideline sentence.

13      I just wanted to make sure that Mr. Henzel would be
14  aware of that and ask the Court to advise him the government
15  is not bound to ask for a guideline sentence in this case.

16      THE COURT:  Okay.  Thank you.  Mr. Henzel, you and
17  Mr. Crawford -- Mr. Henzel, did you hear what the government
18  attorney just stated?

19      THE DEFENDANT:  Uhmm...

20      THE COURT:  That they're not legally bound, since
21  there's no plea agreement, to ask for a guideline sentence.
22  They can ask for any sentence.

23      THE DEFENDANT:  Okay.

24      THE COURT:  Above the guideline.

25      THE DEFENDANT:  I understand, Your Honor.

1    THE COURT:  Knowing that, do you still wish to enter
2  your plea of guilty without benefit of a plea agreement?
3          THE DEFENDANT:  Yes, Your Honor.
4          THE COURT:  Mr. Henzel and Mr. Crawford, the Court
5  has before it a stipulated factual basis, and on the last page
6  there purports to be signatures, "Samuel T. Henzel" and "Jack
7  Crawford."
8      Mr. Henzel, did you review the stipulated factual
9  basis?
10         THE DEFENDANT:  Yes.
11         THE COURT:  And that's your signature on the third
12  page?
13         THE DEFENDANT:  Yes.
14         THE COURT:  And, Mr. Crawford?
15         MR. CRAWFORD:  Yes, yes, Judge.
16         THE COURT:  And, Mr. Cook, you've reviewed this
17  stipulated factual basis and that's your signature also,
18  counsel?
19         MR. COOK:  It is, Your Honor.
20         THE COURT:  All right.  Mr. Crawford, anything you
21  need to add, change or correct with respect to the stipulated
22  factual basis?
23         MR. CRAWFORD:  No.
24         THE COURT:  All right.  I'm just about done asking
25  you questions, Mr. Henzel, and ready to ask you in a final and

1   formal way how you plead to these charges.  Before I do that,

2   do you have any questions you want to raise with me or your

3   attorney Mr. Crawford?

4           THE DEFENDANT:  No, Your Honor.

5           THE COURT:  In light of everything I've explained to

6   you today, and upon advice from your attorney, how do you

7   plead to the charge of travel with intent to engage in illicit

8   sexual conduct, as charged in Count 1 of the information?

9           THE DEFENDANT:  I plead guilty, Your Honor.

10          THE COURT:  All right.  The Court is satisfied with

11   the responses given during the hearing.  Therefore, it is the

12   finding of the Court in the case of United States of America

13   versus Samuel T. Henzel, the defendant is fully competent and

14   capable of entering an informed plea; that the defendant is

15   aware of the nature of the charges and the consequences of his

16   plea without benefit of a plea agreement; and that the plea of

17   guilty is knowingly and voluntarily made.  It is supported by

18   an independent factual basis, which is a stipulated factual

19   basis, which contains all of the essential elements of the

20   offense.  The plea agreement -- the plea of guilty is

21   therefore accepted and the defendant is now adjudged guilty of

22   that offense.

23         All right.  It is my understanding that the parties do

24   wish to proceed with sentencing at this time; is that correct,

25   Mr. Crawford?

1      MR. CRAWFORD:  Yes, Your Honor.

2      THE COURT:  Government, are you ready?

3      MR. BLACKINGTON:  Yes, Your Honor.

4      THE COURT:  Has the government had an opportunity to
5 review the presentence investigation report?

6      MR. COOK:  Yes, Your Honor.

7      THE COURT:  And does the government have any
8 objections to the report?

9      MR. COOK:  No objections from the government, Your
10 Honor.

11      THE COURT:  Mr. Crawford, we're going to discuss
12 your objections.

13      MR. CRAWFORD:  Yes, Judge.

14      THE COURT:  Mr. Henzel, have you had an opportunity
15 to read over the presentence investigation report; that
16 document (indicating)?

17      THE DEFENDANT:  Uhmm, yeah, I have read this before.

18      THE COURT:  All right.  And, Mr. Crawford, you've
19 reviewed this with your client and you do in fact have
20 objections; is that correct?

21      MR. CRAWFORD:  We do, Judge.

22      THE COURT:  You may proceed to make any comments.

23      The Court notes your objections were in writing and
24 the government did file a response, but if you would.

25      MR. CRAWFORD:  Judge, the defendant makes a

1   strenuous objection to paragraphs 27 and 28 of the presentence

2   investigation report, insofar as the report includes a base

3   offense level for this crime of level 30, and includes an

4   enhancement of four levels because force, or threat of force

5   was used in the commission of the offense.  The report

6   cross-references a different section of the guidelines.

7       It is the defendant's position that he should be

8   sentenced pursuant to Section 2G1.3 of the United States

9   Sentencing Guidelines, which is the provision directly

10  applicable to this offense, 2G1.3.

11      The United States Probation Department has

12  cross-referenced that guideline to Section 2A3.1, criminal

13  sexual abuse, because the Probation Department feels that

14  there is evidence by a preponderance to show that Mr. Henzel

15  used force or threat of force against Jane Doe in the

16  commission of the underlying charge.

17      It is the position of the defendant that absolutely no

18  force was used, no force was threatened by Mr. Henzel against

19  Jane Doe, and we contest the substantial enhancement.

20      I want the Court to understand that there are

21  basically two enhancements U.S. probation has put in their PSI

22  report.  When you cross-reference 2G1.3 to 2A3.1, that's an

23  increase of six levels.  The base offense level for 2G1.3,

24  which we contend is applicable in this case, is 24.  If you

25  cross-reference to criminal sexual abuse under 2A3.1, the base

1  offense level goes from 24 to 30.  It's a six level increase.

2  And then U.S. probation adds an enhancement under 2A3.1(b)(1),

3  being if the offense level involves conduct described in 18

4  U.S.C. 2324(a) or (b) increase by four levels.  18 23 –– 2241

5  Sections (a) and (b) are –– involve conduct with threat or

6  a –– with use of force or threat of force.

7       So by injecting an element of force in this case,

8  Judge, the offense level jumps from 24 –– with the

9  enhancement –– to 34.  That's an increase of 10 levels, with a

10  substantial increase in the sentencing range for this

11  defendant.

12       So the gravity of this application is obvious.

13  Mr. Henzel's range of sentencing jumps from anywhere from

14  seven to nine years, up to 14 to 16 years.  It's a substantial

15  enhancement.  And we think the government must establish

16  evidence to show by a preponderance that enhancement is

17  applicable.

18            THE COURT:  Thank you, Mr. Crawford.

19       Is the government prepared to present that evidence?

20            MR. COOK:  Yes, Your Honor.

21            THE COURT:  All right.  Mr. Crawford, you and

22  Mr. Henzel may have a seat.

23       Mr. Cook, you may call your first witness.

24            MR. COOK:  Thank you, Judge.  Your Honor, at this

25  time the government would call A.G, referred to in the

1  charging information as Jane Doe.

2       THE COURT:  Counsel, can we refer to her as Jane Doe

3  throughout the proceeding so we don't have to redact?

4       MR. COOK:  Yes, Your Honor.

5       THE COURT:  Witness, would you come up, Jane Doe.

6  Come right here to Tanesa.  She's going to put a microphone on

7  you.

8       I need you to face me and raise your right-hand.

9            JANE DOE, GOVERNMENT'S WITNESS, SWORN

10      THE COURT:  All right.  You may have a seat.  If you

11  would, go ahead and look at the government attorney.  He's

12  going to ask you some questions on direct examination.

13      MR. COOK:  May I proceed, Your Honor?

14      THE COURT:  You may, counsel.

15                   DIRECT EXAMINATION

16  BY MR. COOK:

17  Q   Good morning.

18  A   Good morning.

19  Q   Let me just start by noting that this will be a somewhat

20  awkward process, as I'm going to refer to you as Jane Doe this

21  morning, okay?

22      So if I refer to you as Ms. Doe, I'm referring to you;

23  do you understand?

24  A   (Nodding of head).

25      THE COURT:  I need you to answer every question out

1  loud.  You can't nod your head.  Everything is being tape

2  recorded.  Speak out loud to that microphone that's hooked to

3  you.

4          THE WITNESS:  Okay.

5          THE COURT:  Thank you.

6  BY MR. COOK:

7  Q   How old are you right now?

8  A   I am now 13.

9  Q   And when was your birthday that you turned 13?

10  A   XXXX.

11  Q   Was that this year, 2011?

12  A   Yes.

13  Q   What grade are you in school?

14  A   Seventh.

15  Q   What sort of activities do you do in school?

16  A   I do art, PE and additional clubs after school.

17  Q   All right.  And speaking generally, where do you live?

18  A   Carmel.

19  Q   You live in Carmel.

20      Is that here in Indiana?

21  A   Uh–huh.

22  Q   What sort of things do you do for fun outside of school?

23  A   I hang out with my friends or go swimming.

24  Q   All right.  I want to talk to you about your use of

25  computers and cell phones.

1          Do you have a computer in your home?

2   A    Yes.  But there's no Internet access on it.

3   Q    All right.  Was that the case back in October of 2010,

4   last year?

5   A    Yes.

6   Q    And did you have a cell phone back around October of last

7   year?

8   A    Yes.

9   Q    When you wanted to use the Internet, both now and looking

10  back to October of that year, how did you make use of the

11  Internet?

12  A    I would go on Facebook or watch some videos on line.

13  Q    All right.  Where did you do that since you did not have

14  Internet access at home?

15  A    I would usually be at a friend's house if I ever used it.

16  Q    Okay.  Have you ever heard of "Chat Software" on the

17  Internet?

18  A    Yes.

19  Q    What is Chat?

20  A    Chat is where you talk to other people on the Internet.

21  Q    And do you do that -- how is it different than e-mail?

22  A    E-mail you have to add people you know in order to send it

23  off to someone.

24  Q    You have to know a specific address for e-mail; is that

25  right?

1  A    Yes.

2  Q    And for Chat, you're doing it actually in realtime; is

3  that correct?

4  A    Uh-huh, yes.

5  Q    As opposed to do an e-mail, you send it and they might

6  read it later, right?

7  A    Yes.

8  Q    But Chat actually happens one minute to the next; is that

9  right?

10 A    Yes.

11 Q    Looking back towards the end of September and October of

12 last year, did you use the Chat function on the Internet?

13 A    Yes.

14 Q    And where did you use that?

15 A    I used it at one of my old friend's houses.

16 Q    Okay.  And where on the Internet did you use that Chat

17 software?

18 A    Do you mean what website?

19 Q    Yes, what website?

20 A    Uhmm, IMVU.

21 Q    IMVU?  And does IMVU work like the Chat we've spoken about

22 happens in realtime and you speak with certain people?

23 A    Yes.

24 Q    How would you meet people with whom you would speak on

25 IMVU?

1  A    You can use something on Chat now that choose a boy or

2  girl and takes you around to a person.

3  Q    And would you sometimes Chat with more than one person at

4  once?

5  A    Yes.

6  Q    Okay.  I want to draw your attention to the end of

7  September of 2010.

8        What grade were you in?

9  A    Seventh.

10  Q    Okay.  Just like you are now, correct, same school year?

11  A    (Nodding of head).

12  Q    I need you to speak out loud.

13  A    Yes.

14  Q    So same school year, yes?

15  A    Yes.

16  Q    Did you meet anyone with whom you spoke quite a bit on

17  IMVU Chat at the end of September 2010?

18  A    Yes.

19  Q    And who is that person or --

20  A    Samuel T. Henzel.

21  Q    Okay.  And how did that -- what was that person's name on

22  IMVU Chat?

23  A    I don't remember what it was.

24  Q    Okay.  And there are certain names that people have on

25  these chat lines; is that correct?

1  A    Yes.

2  Q    Do you remember what your name was?

3  A    L4DCHICK15.

4           THE COURT:  Can you say it one more time?

5           THE DEFENDANT:  L4DCHICK15.

6           THE COURT:  The number 4?

7           THE DEFENDANT:  Yeah.

8           THE COURT:  L4DCHICK13?

9           THE DEFENDANT:  Fifteen.

10          THE COURT:  Thank you.

11 BY MR. COOK:

12 Q    What does the "L", the number "4," the letter "D" stand

13 for?

14 A    Video game called "Left for Dead".

15 Q    Is that a video game you played quite a bit?

16 A    Yes.

17 Q    And what was the "15" supposed to mean?

18 A    Fifteen was a number I always had.  In every class I'd be

19 number 15 and it's my lucky number.

20 Q    Okay.  And on IMVU Chat, did you have a certain profile

21 that went along with your screen name?

22 A    Uhmm, yes.

23 Q    And information you had about yourself other users could

24 see; is that correct?

25 A    Yes.

1  Q   What did your profile say about you?

2  A   It said I was 16 or 14, and there would -- it would say

3  like what kind of things I like, but nothing personal.

4  Q   Do you remember what this particular profile said that you

5  liked?

6  A   It said I liked "Left for Dead" and sequel, and how I

7  didn't like the "Twilight Saga."

8  Q   I want to turn your attention back toward the end of 2010.

9       You started talking to someone on IMVU Chat, correct?

10 A   Yes.

11 Q   And that person turned out to be a person that you came to

12 know as Samuel Henzel; is that right?

13 A   Yes.

14 Q   And you don't recall specifically what the screen name

15 was?

16 A   Yes.

17 Q   Was there a profile, however, connected to that screen

18 name, whatever it was?

19 A   Yes.

20 Q   What did the profile claim to say about that person?

21 A   All I remember is it said it was 14 at the most, I think.

22 Q   When you say "14," are you speaking of --

23 A   Age.

24 Q   -- age?

25       How did you first come to be talking with this person

1  through the Chat software?

2  A    I used "chat now" to "random chats."

3  Q    Okay.  And it ended up taking you to this --

4  A    Yes.

5  Q    And what sort of things did you first start talking to

6  this person about?

7  A    Uhmm, like where we're from, and what we liked to do

8  during -- like after school or video games.

9  Q    Okay.  I want to jump forward in the process just a little

10 bit by way of reference here, okay?

11        You eventually ended up meeting this person in real

12 life, correct?

13 A    Yes.

14 Q    How long was it between the first time that you chatted

15 with this person through IMVU and when you actually met him in

16 person?

17        How many days was that?

18 A    I think about a month or maybe three weeks.

19 Q    Okay.  So around three weeks or so; does that sound right?

20        Not a very long time?

21 A    Yes.

22 Q    You initially started talking, you said, about video games

23 and so forth?

24 A    Yes.

25 Q    How did the chat between you and this person progress as

1  days went by?

2  A    It would usually progress -- like we would have maybe a

3  deep friendship.

4  Q    And as you approached the day that you actually ended up

5  meeting this person -- we'll call it "in the real world--" as

6  you met this person "in the real world," did you feel like you

7  and this person were close friends?

8  A    Yes.

9  Q    How would you describe your relationship to this person?

10  A    Really close.

11  Q    Okay.  Was it -- before the time that you met, did you

12  start having, I suppose for lack of a better word, any sort of

13  romantic feelings toward this person?

14  A    A bit.

15  Q    And as it approached the day you were going to meet this

16  person, were you actually pretty excited to meet this person?

17  A    At first.  Then it kind of died away and more kinda really

18  badly nervous.

19  Q    But for a while you were actually excited about meeting

20  this person?

21  A    Yes.

22  Q    In addition to the IMVU Chat, did you communicate with

23  this person via other methods?

24  A    Yes.

25  Q    What other methods did you use to communicate?

1  A    Text messages and calling.

2  Q    And was there some e-mailing in there as well?

3  A    No e-mails.

4  Q    No e-mails that you recall.

5        So you had this person's cell phone number; is that

6  right?

7  A    Yes.

8  Q    Now, you had stated that the profile that you had on IMVU

9  Chat stated you were either 14 or 16 years old?

10  A    Yes.

11  Q    At some point did you communicate to this person that you

12  were in fact 12 years of age?

13  A    Not that I recall.

14  Q    Okay.  Did you eventually end up talking to this person on

15  the phone?

16  A    Yes.

17  Q    By the time he came to meet you, he knew you were 12

18  though, correct?

19  A    Yes.

20  Q    Did you speak with him or use the Chat software and figure

21  out that he was actually older than the 14 he claimed to be on

22  the profile?

23  A    Yes.

24  Q    How old did you think he was?

25  A    I still thought he was 14, but he said he went up to 17.

1  Q   Okay.  So he was then saying he was 17 years old?

2  A   Yes.

3          THE COURT:  So he told you he was 17?

4          THE WITNESS:  Yes.

5          THE COURT:  Okay.

6  BY MR. COOK:

7  Q   At what point did he tell you he was 17?

8  A   About the same day that I met him.

9  Q   All right.  And had he told you he was going to drive to

10 come meet you?

11 A   Yes.

12 Q   Did you know he lived up around Chicago?

13 A   Yes.

14 Q   So at that point, did you ask the question of:  If you're

15 14, how are you going to drive?

16 A   Yeah –– no.

17 Q   But he told you he was 17 and, therefore, would drive to

18 meet you?

19 A   Yes.

20 Q   Now, some of the text messages that occurred between you

21 and this person who turned out to be Sam Henzel, did you and

22 he make arrangements to meet at –– to eventually go to a hotel

23 in the Westfield area?

24 A   Yes.

25 Q   And that was the Comfort Suites Hotel?

1  A    Yes.

2  Q    Now, one of the text messages you sent him stated you

3  actually went to the hotel to sort of scout it out, take a

4  look at it?

5  A    Yes.

6  Q    Did you actually go to the hotel to scout it out and take

7  a look at it?

8  A    No, because I can't bike that far.

9  Q    How far is the hotel from your house?

10 A    It's, uhmm, about maybe an hour or more from where I am.

11 Q    All right.  It's a long way; little too far to bike?

12 A    (Nod of head).

13 Q    Okay.  But you told him you had gone to check it out?

14 A    Yes.

15 Q    Why did you tell him that?

16 A    I don't know.

17 Q    But that's what you told him.  And you told him you were

18 excited to meet him.

19        Was it going to be the next day?

20 A    Yeah.

21 Q    So we come to the day that you're going to meet him, and

22 this is in October 2010; is that right?

23 A    Yes.

24 Q    Just one moment, please.

25        Does October 30th sound about right?  Or do you

1  remember specifically?

2  A   October 30th?  Yes.

3  Q   Okay.  What kind of arrangements -- at this point you and

4  the person who turned out to be Sam Henzel had arranged to

5  meet in person; is that right?

6  A   Yes.

7  Q   What were you hoping to do once you met Mr. Henzel in

8  person?

9  A   Play video games.

10 Q   You wanted to hang out and kind of explore what it was to

11 be a friend with this person?

12 A   Yes.

13 Q   Play video games with him.  Okay.

14       Where did you arrange to meet, to make your way to the

15 hotel?

16 A   Where would we meet?

17 Q   What arrangements did you make to meet?

18 A   I would bike to the hotel.

19 Q   Okay.  And so, you got on your bike and left your home.

20       Do you remember about what time it was?

21 A   I think 3:00 or 4:00.

22 Q   And once you got on your bike and started riding, did you

23 have further contact with Mr. Henzel?

24 A   Yes.

25 Q   How did that contact occur?

1  A    Through cell phone.

2  Q    Did you use text messages or a telephone?

3  A    Telephone.

4  Q    What sort of things did you talk about as you were, I

5  suppose, on your bike, on your way to meet him?

6  A    He would tell me directions to the hotel.

7  Q    Okay.  And did you end up riding your bike to the hotel?

8  Or, what happened?

9  A    I stopped maybe a few -- maybe about five minutes away

10  from it.

11  Q    Was this in the area of Perry and 146th?

12  A    I think down near Perry Road, near the BP.

13  Q    Not quite at the hotel.

14        And why did you stop there?

15  A    'cause I felt really badly nervous and I really didn't

16  want to go.

17  Q    Okay.  Did you speak with Mr. Henzel then at that point?

18  A    No.

19  Q    How did you end up finally meeting him in person?

20  A    He drove past me and he honked and waved.

21  Q    Okay.  At this point you're on your bike up around Perry

22  Road area; is that right?

23  A    Yes.

24  Q    When he drove past you and honked and waved, what did you

25  think was happening there?

1  A   I noticed he wasn't as old as he said he was.

2  Q   I'm sorry.  Do you mean as young as he said he was?

3  A   Yes.

4  Q   Okay.  And did you immediately know it was the Sam that

5  had been speaking to you?  Or, what did you think?

6  A   Uhmm, since he honked and waved, I thought that was him.

7  Q   And what did he -- did he actually stop the car and say

8  anything to you?

9  A   He told me to keep going.

10  Q   Okay.  What did you think upon seeing him?

11  A   It was scary.

12  Q   Okay.  And -- but you did end up actually following his

13  car on your bike, correct?

14  A   Yes.

15  Q   Why did you do that despite the fact that he seemed kind

16  of scary to you?

17  A   I don't know.  It was probably 'cause I felt like maybe he

18  had something with him if I didn't try to go.

19  Q   All right.  So you felt like you needed to follow him?

20  A   Yes.

21  Q   And did you still think that maybe you two could be

22  friends?  Even though he was older, you could still talk about

23  video games and so forth?

24  A   Yes.

25  Q   And you had actually gotten pretty close with him through

1  the chatting and cell phones and so forth?

2  A   Yes.

3  Q   So you had a mixture of being a little scared and still

4  thinking you could be friends?

5          MR. CRAWFORD:  I object.  I know it's a child

6  witness, but the leading nature, little bit scared, goes to

7  the central issue, so I object.

8          THE COURT:  I'll sustain on that question, counsel.

9          MR. COOK:  All right.

10  BY MR. COOK:

11  Q   Did you end up following him then down the street on your

12  bike?

13  A   Yes.

14  Q   How did -- did you end up riding your bike all the way to

15  the hotel or did something else happen?

16  A   I stopped and started to cry a bit.  He stopped near me

17  and told me to get in his car and he'd drive me there.

18  Q   Did you end up getting in his car with him?

19          THE COURT:  Did you say you stopped and started to

20  cry a bit?

21          THE WITNESS:  Yes.

22  BY MR. COOK:

23  Q   What did you do with your bike at that point?

24  A   I left it where I was, where I stopped.

25  Q   Left it on the side of the road?

1  A    Yes.

2  Q    Once you got in the car with Mr. Henzel, did you guys talk

3  about anything there?

4  A    He asked me why I looked so nervous.

5  Q    All right.  What did you say to him?

6  A    I said 'cause it -- I've never really done anything like

7  ride to a hotel to meet someone that I haven't really known

8  that well.

9  Q    What did he have to say about that?

10  A    He said not to be nervous.

11  Q    Did that help you not to be nervous?

12  A    No.

13  Q    How long was that car ride from where you got in

14  Mr. Henzel's car until you got to the hotel?

15  A    About five minutes.

16  Q    And did you actually drive all the way up to the hotel

17  with him or did you get out some point sooner?

18  A    He stopped at the gas station next to it.

19  Q    And why did he stop there?

20  A    I don't know.

21  Q    Okay.  Did you get out there at the gas station?

22  A    Yes.

23  Q    All right.  Why did you get out at the gas station?

24  A    He told me to get out the gas station -- get out of the

25  car and go to the hotel that was right next to it.

1  Q   Did he give you like a room number?

2  A   Yes.

3  Q   All right.  And what was the plan then, I suppose, at that

4  point?

5          Were you supposed to go to the room and wait for him?

6  A   Yeah.

7  Q   Okay.  Did you walk into the room?

8  A   Yes.

9  Q   How long was it until Mr. Henzel then came to the room?

10  A   Maybe about 10 minutes.

11  Q   Okay.  What was going through your head at this point?

12  A   Saying maybe I shouldn't be here and I should go home.

13  Q   Okay.  But you didn't go home; is that right?

14  A   (Nodding of head).

15  Q   Out loud, please.

16  A   Yes.

17  Q   Yes, you did not go home?

18  A   Yes.

19  Q   Mr. Henzel showed up in about 10 minutes after you get to

20  the hotel room.

21          Did you actually get inside the room or have to wait

22  outside the --

23  A   I was inside the room already.

24  Q   And when you had been driving to the hotel with

25  Mr. Henzel, did you and he talk about what you would do once

1  you got to the room?

2  A    No.

3  Q    All right.  So you get to the room.  About 10 minutes

4  later he shows up.

5         What did Mr. Henzel say to you when he got to the

6  room?

7  A    He was -- just sat next to me and kept like stroking my

8  arm.

9  Q    Okay.  Did you say anything to him when he came in?

10  A    I told him that he shouldn't do anything he knows he's not

11  supposed to be doing, if he was going to try anything.

12  Q    What did he say to that?

13  A    He said, "Okay.  I won't do anything."

14  Q    Okay.  What did you -- for the first little while that you

15  and Mr. Henzel are in the hotel room, what did you and he do?

16  A    We played video games.

17  Q    What video game did you play?

18  A    "Left for Dead II".

19  Q    This was one of the video games you had chatted with him

20  about on the IMVU Chat?

21  A    Yes.

22  Q    So he brought a video game system with him then?

23  A    Yes.

24  Q    Did you bring the game or did he bring the game?

25  A    He brought the game.

1  Q   Had you told him about how that was one of your favorite
2  games?
3  A   Yes.
4  Q   How long did you play the "Left for Dead II" video game
5  with Mr. Henzel?
6  A   About maybe five to 10 minutes.
7  Q   Did you all talk during this time or just play the video
8  game?
9  A   Just played the video game.
10 Q   After that five or 10 minutes of playing the video game,
11 what happened?
12     Was the game just kind of you hit a "game over" point
13 or how did it --
14 A   I wanted to play a different video game that he had.
15 Q   Do you remember what video?
16 A   I think "Red Dead Redemption."
17 Q   Did you play that video game with him too?
18 A   No.
19 Q   What happened?
20 A   When I was about to change the game he slapped my butt.
21 Q   Did you say anything when he slapped your butt?
22 A   I stayed quiet.  I don't know why I did.
23 Q   Okay.  Did he say anything when he slapped your butt?
24 A   No.
25 Q   What happened after he slapped your butt?

1  A    I sort of felt really, really badly uncomfortable.

2  Q    Okay.  Did you let him know you were feeling

3  uncomfortable?

4  A    No.

5  Q    Okay.  Why didn't you let him know at that point you were

6  feeling uncomfortable?

7  A    Maybe because -- I really don't know why I didn't.

8  Q    What happened after that?

9  A    I did the -- I tried to act really tired, like I -- so

10  maybe I could try to get out.

11  Q    All right.  So you tried to act really tired.

12        How did you act really tired?

13  A    Like I laid on the bed curled up saying, "I'm tired.  I

14  don't want to do anything right now."

15  Q    Okay.  How did Mr. Henzel react to you laying on the bed

16  and saying you were tired?

17  A    He just told me, you know, "You're not tired.  You're just

18  acting."

19  Q    Okay.  And so how did things then progress?

20        What happened after he told you you were acting

21  instead of actually tired?

22  A    He was just sitting next to me, and I was staying curled

23  up on the bed, and he kept like touching my arm, which made me

24  feel even more uncomfortable.

25  Q    Did you say anything to him at that point?

1  A    No.  I was staying quiet almost the whole time.

2  Q    All right.  What happened after he was stroking your arm?

3  A    I got up, and I went out of the bedroom, and I went to the

4  couch that was outside of it, outside of the bedroom.

5  Q    So this was a motel room with two rooms in it?

6  A    Yes.

7  Q    One of the rooms had a couch.

8        Is that where you were playing video games?

9  A    No.

10 Q    One of the rooms had a couch and one actually had a bed;

11 is that right?

12 A    Yes.

13 Q    So you went -- did you sit on the couch?

14 A    Yes.

15 Q    What happened after you sat down on the couch?

16 A    I started feeling really more -- well, just stayed nervous

17 most of the time.  Just sat there like playing with my

18 fingers.

19 Q    Did Mr. Henzel then come out to the room with the couch in

20 it?

21 A    Yes.

22 Q    Did he say anything to you at this point?

23 A    No.

24 Q    Okay.  What happened when he came out to the room to the

25 couch you were sitting on?

1  A    I think I recall he was at the small kitchen that was next
2  to the couch.  I think he was pouring himself a drink.
3  Q    Did he pour you a drink also?
4  A    Uhmm, when I first came into the room he gave me a drink.
5  Q    Okay.  And what kind of drink was it?
6  A    It was Red Bull.
7  Q    Okay.  And did you have -- did you drink any of the Red
8  Bull?
9  A    Yes.
10 Q    Okay.  Was it only Red Bull?
11 A    He told me there was some alcoholic beverage in it.
12 Q    He told you it was Red Bull and some kind of alcoholic
13 beverage?
14 A    Yes.
15 Q    How much did you have to drink?
16 A    I think a sip.
17 Q    I want to go back to your sitting on the couch and he's in
18 the kitchen pouring himself a drink.
19      What happened after he poured himself a drink?
20 A    I was still playing with my fingers.  He sat next to me
21 after he had his drink.
22 Q    What happened after he sat next to you?
23 A    He had a glass thing that I didn't really know what it
24 was, but it was marijuana in it.
25 Q    Okay.  And what did he do with this marijuana?

1  A    He told me to inhale whatever was in there.

2  Q    Okay.  And did you do that?

3  A    Yes.

4  Q    Okay.  Had you ever had any marijuana before this time?

5  A    No.

6  Q    Okay.  What happened after that?

7  A    Uhmm, I was coughing because some of the smoke got caught

8  in my throat.

9  Q    Okay.  And did Mr. Henzel say anything at that point?

10  A    Uhmm, he took -- he inhaled some of the smoke as well.

11  Q    What did he do after he inhaled the smoke?

12  A    He told me he wanted to show me something called "a

13  shotgun," which is when someone blows marijuana smoke into

14  your mouth.

15  Q    Did Mr. Henzel do that with you?

16  A    Yes.

17  Q    Was that the end of the marijuana or did that occur

18  anymore?

19  A    It didn't occur anymore.

20  Q    Okay.  What happened after that?

21  A    I went back to the bed because I was trying to avoid him

22  somehow.

23  Q    Okay.  And did you say anything to him or were you just

24  trying to, I guess, avoid him?

25  A    Trying to avoid.

1  Q   And what did you do when you got back to the bed?

2  A   Uhmm, I stayed -- I sat on the bed with my knees up to my

3  chin, just sitting down on the bed.

4  Q   Okay.  And did he come back into the bedroom?

5  A   Yes.

6  Q   What happened after he came back into the bedroom?

7  A   He gave me repeated kisses.

8  Q   Did he say anything to you as he did that?

9  A   No.

10  Q   Did you say anything to him?

11  A   No.

12  Q   How did you feel as that was occurring?

13  A   I felt sort of dirty.  Like I didn't feel very good at

14  all.

15  Q   Okay.  What occurred after he was giving you the kisses?

16      And were these on your lips or --

17  A   On my lips.

18  Q   Okay.  What occurred after that?

19  A   Uhmm, I laid -- he laid me down on the bed.

20  Q   Were all your clothes on at this point?

21  A   Yes.

22  Q   What were you wearing that day?

23  A   I was wearing, I think a tank top with some jeans.

24  Q   What happened after Mr. Henzel laid you down on the bed?

25  A   He kept kissing me and he was feeling my chest.

1  Q   Did you say anything as he was doing this?

2  A   I wanted to tell him to stop, but I was really scared, so

3  I stayed quiet.

4  Q   Did he say anything to you as he was doing this?

5  A   No.

6  Q   What happened after he was rubbing your body with his

7  hands?

8  A   Uhmm, he put his hands under my shirt and then he still —

9  sort of playing — started feeling my chest still.

10 Q   And this is now under your shirt?

11 A   Yes.

12 Q   Okay.  And what happened after that?

13 A   Then he started playing with the button of my pants.

14 Q   Okay.  Did you say anything to him at this point?

15 A   No.

16 Q   Did he say anything to you?

17 A   He told me I should wear loser pants.

18         MR. CRAWFORD:  I'm sorry, Judge, I didn't hear that.

19         THE COURT:  "He told me I should have worn loser

20 pants."

21         MR. CRAWFORD:  Thank you.

22 BY MR. COOK:

23 Q   Did you say anything in response to that?

24 A   I didn't say anything.

25 Q   What happened after he was playing with the button on your

1  jeans?

2  A    I just –– I like bent my leg a bit, like so maybe it would

3  be harder to take off my pants if he was trying to.

4  Q    I'm sorry, you said you bent your leg a little bit?

5  A    I bent my leg a bit.

6  Q    Did he then try to take your pants off?

7  A    Yes.

8  Q    Did –– was this the point he tried to take your pants off?

9  A    Yes.

10  Q    How did you react as he was trying to take your pants off?

11  A    I tried my best to find a way that it would be mostly

12  impossible to take my pants off.

13  Q    Okay.  And how did you –– how did you do that?

14      How did you do your best to make that impossible?

15  A    I crossed my legs.

16  Q    And did that stop him from getting your pants off you?

17  A    Yes.

18  Q    All right.  What did he say once you crossed your legs?

19  A    He didn't say anything.

20  Q    Did you say anything to him at that point?

21  A    No.

22  Q    All right.  What happened after you had crossed your legs

23  to stop him from getting your pants off?

24  A    I don't remember.

25  Q    Okay.  At some point did Mr. Henzel get your pants off of

1  you, however?

2  A    Yes.

3  Q    Did he take them off of you or did you take them off of

4  you?

5  A    I took them off.

6  Q    At what point did you take them off?

7  A    Maybe a few minutes after that.

8  Q    Why did you take them off.

9  A    Because he kept trying to get me undressed.

10 Q    All right.  And then you ended up doing it on your own

11 after he kept trying to get you undressed?

12 A    Yes.

13 Q    Did you say anything to him as you did that?

14 A    That I felt very uncomfortable.

15 Q    Okay.  You told him that you felt very uncomfortable?

16 A    Yes.

17 Q    And how did he respond?

18 A    He told me he wasn't going to hurt me.

19 Q    Okay.  After your pants came off -- were you on the bed

20 when this occurred?

21 A    Yes.

22 Q    What happened after your pants came off?

23 A    He started touching my body all over.

24 Q    Okay.  At this point was your underwear still on?

25 A    Yes.

1  Q    Was your shirt still on?

2  A    No.

3  Q    Okay.  Did you have a bra on that day or just a shirt?

4  A    I had a bra on.

5  Q    Was your bra still on at this point?

6  A    Yes.

7  Q    What happened after he was touching your body all over?

8  A    I felt like I really needed to do something.  Like I

9  wanted to go home really badly.

10 Q    Okay.  Did you tell him this or did you tell him anything

11 at this point?

12 A    I didn't tell him anything.

13 Q    Okay.  But you felt like you wanted to go home pretty

14 badly?  Okay.

15       What happened?

16 A    Uhmm, he took my underwear off.

17 Q    Did you say or do anything as he took off your underwear?

18 A    I whimpered a bit because I didn't want anything to

19 happen.

20 Q    I'm sorry.  You...

21 A    I didn't want anything to happen at that point, so I

22 started whimpering a bit.

23       THE COURT:  I need you to talk a little bit louder

24 so I can hear you.

25       Can you repeat that?

1    THE WITNESS:  I didn't want anything to happen

2  beyond that, so I started whimpering a bit.

3  BY MR. COOK:

4  Q    Did he say anything after you started whimpering?

5  A    No.  But I recall he said he was going to try to have sex

6  with me.

7  Q    Okay.  Is that the word that he used?

8  A    Yes.

9  Q    Okay.  How did you respond when he said he was going to

10  try to have sex with you?

11  A    I told him I didn't want him to do that.

12  Q    You actually told him you didn't want to do that?

13  A    Yes.

14  Q    What did he say when you said that?

15  A    He told me if –– if –– if it hurts he'll stop.

16  Q    Okay.  Did you say anything further at that point?

17  A    No.  I stayed really quiet because I was really scared.

18  Q    Did your bra come off at any point?

19  A    Not that I remember.

20  Q    Okay.  After you had told Mr. Henzel that you didn't want

21  to have sex and were whimpering, what happened?

22  A    He tried to put himself inside me, however you say it.

23  Q    Okay.  Before that happens, did he –– did you and he

24  perform any –– like oral sex at all?

25  A    Yes.

1  Q   How did that happen?  Explain that if you could, please.

2  A   He told me to do something that was called 69.

3  Q   Okay.  And did you know what that was?

4  A   No.

5  Q   Did he explain to you what that was?

6  A   Yes.

7  Q   Okay.  And did you say anything about that to him when he

8  asked you to do that?

9  A   That it didn't sound right.

10 Q   Okay.  And what did he say?

11 A   He didn't say anything.

12 Q   Okay.  So what happened after you guys -- after you said

13 that to him, that it didn't sound right?

14 A   He told me to do it anyways.

15          MR. CRAWFORD:  I'm sorry, Judge.

16          THE COURT:  Can you repeat that a little louder?

17          THE WITNESS:  That he told me do it anyways.

18 BY MR. COOK:

19 Q   What happened after he told you to do it anyways?

20 A   We did that.

21 Q   Okay.  When you say you did "that" -- when you say that

22 you "did that," uhmm, whose body was where?

23 A   Mine was on top of his.

24 Q   Okay.  And did his mouth end up touching your vagina?

25 A   Yes.

1  Q   And did his penis end up touching your mouth?

2  A   Yes.

3  Q   Okay.  How long did this go on?

4  A   It seemed like a long time, but it was like maybe three

5  minutes.

6  Q   Okay.  After that was over, what happened?

7  A   He tried to have sex with me.

8  Q   Okay.  And was this at the point he told you he wanted to

9  have sex with you?

10 A   Yes.

11 Q   At that point you told him you didn't want to do that; is

12 that right?

13 A   Yes.

14 Q   Did you like say anything or make any noise when he tried

15 to have sex with you?

16 A   Uhmm, I told him I didn't want to do any of this.

17 Q   All right.  You told him you didn't want to do any of

18 this?

19 A   Yes.

20 Q   How did he respond?

21 A   He was still quiet.

22 Q   Okay.  And did he end up trying to have sex with you

23 anyway?

24 A   Yes.

25 Q   I'm sorry to ask you to, can you explain how that

1 happened?

2 A   He tried putting his penis in my vagina.

3 Q   Okay.  And did it actually go inside at all?

4 A   No.

5 Q   Okay.  Did it start to go inside and it hurt and you made

6 a noise?

7 A   Yes.

8 Q   Okay.  And what did he say when that happened?

9 A   He stopped, but he didn't say anything.

10          THE COURT:  How did he know it hurt?

11          A JUROR:  I made a loud sound signaling that it did

12 hurt.

13          THE COURT:  Can you tell me the sound you made?

14          THE DEFENDANT:  It was like a loud whimper.

15          THE COURT:  Okay.

16 BY MR. COOK:

17 Q   You had stated earlier that you whimpered a little bit

18 when he took your underwear off?

19 A   Yes.

20 Q   Did you keep whimpering or just --

21 A   First.

22 Q   How many times would you say that you told Mr. Henzel that

23 you didn't want to engage in sex acts with him?

24 A   Maybe more than 10 times.

25 Q   Okay.  How were you feeling during the times that the sex

1  acts occurred?

2  A    Like I felt a bit helpless mostly.

3  Q    And aside from saying to Mr. Henzel you didn't want sex

4  acts to occur, did you signal to him other ways?

5        You stated one time you whimpered an additional time.

6  When he started to penetrate your vagina, that you whimpered.

7        Were there other times you kind of verbalized, said

8  anything, made any noises?

9  A    No.

10  Q    Okay.  After Mr. Henzel stopped trying to penetrate you,

11  what happened after that?

12  A    I quickly put my clothes on and told him I had to go

13  somewhere.

14  Q    What did he say to you at that point?

15  A    He told me, "I haven't come all this way for just this to

16  happen."

17  Q    Okay.  What did you say in response to that?

18  A    I told him maybe he shouldn't have tried to even go all

19  this way if he knew it was bad for him.

20  Q    Okay.  Did you eventually leave the hotel room?

21  A    Yes.

22  Q    How did -- describe to me the process by which that

23  occurred and what you and he said to each other as you were

24  leaving?

25  A    Since he told me he didn't come all this way, I told him

1  he shouldn't have tried to do something that was bad for him.

2  He told me he paid all this money.  I told him he shouldn't

3  have.  And then they -- I opened the door and left.

4  Q   Okay.  Were you scared during the time that these sex acts

5  were occurring?

6  A   Yes.

7  Q   Did you want them to happen?

8  A   No.

9  Q   And you had told him you didn't want those to happen,

10 correct?

11 A   Yes.

12 Q   What did you do once you left the hotel room?

13 A   I went straight out one of the nearest exits and called my

14 mom.

15 Q   Okay.  And do you remember what you said to your mom?

16 A   Since I was really scared, I over exaggerated saying

17 someone took me and also hurt me.

18 Q   Okay.  And what -- when you say you "over exaggerated,"

19 you're talking about the "someone took me" part?

20 A   Yeah.

21 Q   So your mother told you to call the police; is that right?

22 A   Yes.

23 Q   Was it your understanding that she and/or your step-dad

24 were going do drive over there as well?

25 A   Yes.

1  Q    Did you call the police?

2  A    Yes.

3  Q    What did you initially report to them when you made the

4  phone call?

5  A    The same thing I told my mom.

6  Q    And then the police -- how long was it until the police

7  got there?

8  A    Thirteen minutes or maybe more.  Less than 13 minutes.

9  Q    Okay.  Somewhere -- 10, 15 minutes, somewhere between

10 there, is what you're thinking?

11 A     (Nodding of head).

12 Q    Did a police officer talk to you?

13 A    Yes.

14 Q    Did you and the police officer talk about what had

15 occurred or did he just come and pick you up?

16 A    He asked me to tell him like a quick summary of what

17 happened.

18 Q    Okay.  And what was the quick summary you gave the police

19 officer; do you remember?

20 A    That I was biking and someone took me and took me to a

21 hotel.

22 Q    Okay.  Just so we understand, you knew Mr. Henzel, or at

23 least through IMVU Chat you knew him, correct?

24 A    Yes.

25 Q    And you had made arrangements to meet him, correct?

1  A   Yes.

2  Q   And you weren't necessarily excited about it, but you did

3  travel to the hotel with him, correct?

4  A   Yes.

5  Q   But you told the police officer that he had come and just

6  picked you up; is that right?

7  A   Yes.

8  Q   Why did you tell the police officer that he just picked

9  you up off the street?

10 A   Because I was still scared, and I felt like if I told him

11 that I was riding with him that it would get me in really bad

12 trouble.

13 Q   Okay.  After the police officer picked you up, did you

14 travel that night to St. Vincent's Hospital?

15 A   Yes.

16 Q   Okay.  And you were taken there to see a nurse who might

17 do a physical exam on you, right?

18 A   Yes.

19 Q   Did that physical exam happen that evening?

20 A   No.

21 Q   Why was that?

22 A   I felt very uncomfortable with people touching my body

23 after all that.

24 Q   You requested that not occur?

25 A   Yes.

1  Q   The following day, did you –– I'm sorry, was it later in

2  the evening that you first went to Chaucie's Place and

3  interviewed about what had occurred?

4  A   Yes.

5  Q   When you talked to Chaucie's Place, you did not describe

6  to them any sex acts occurring; is that right?

7  A   Yes.

8  Q   Why didn't you describe those to Chaucie's Place?

9  A   Because it was –– they told me it was a safe place, it

10 would still be recorded and videotaped, and I thought my mom

11 would watch, and I would be scared and get in really deep

12 trouble.

13 Q   What were you afraid of getting in trouble about?

14 A   That sex happened and that I wanted to meet him.

15 Q   So you were afraid of getting in trouble for wanting to go

16 meet him and that some kind of sex acts had occurred?

17 A   Yes.

18 Q   And you're also not necessarily allowed to use the

19 Internet too much; is that right?

20 A   Yes.

21 Q   And you had been using the Internet quite a bit to talk to

22 him?

23 A   Yes.

24 Q   You have rules in your house about not speaking to

25 strangers and so forth; is that right?

1  A    Yes.

2  Q    How many days later was it that you went back do Chaucie's

3  Place and reinterviewed?

4  A    The next day.

5  Q    Now, that next day you did describe that sex acts had

6  occurred; is that right?

7  A    Yes.

8  Q    And described that you had met Mr. Henzel on the Internet;

9  is that right?

10  A    Yes.

11  Q    And described the sex acts as occurring against your will

12  like you've done today; is that right?

13  A    Yes.

14  Q    What happened between -- what happened overnight between

15  that first interview and the second interview?

16  A    My mom told me anything that happened wasn't your fault at

17  all and shouldn't feel bad about it.  No matter what happened

18  I wouldn't get in any deep trouble.

19  Q    No matter what happened you wouldn't get into any deep

20  trouble?

21  A    Yes.

22  Q    And then you went back to Chaucie's Place and talked about

23  what occurred; is that right?

24  A    Yes.

25  Q    What you've testified about today, is that all the truth?

1  A    Yes.

2  Q    Is that what happened between you and Mr. Henzel?

3  A    Yes.

4  Q    Again, you stated it was around 10 times you told him you

5  didn't want to engage in sex acts; is that right?

6  A    Yes.

7  Q    You stated that you whimpered on at least a couple of

8  occasions?

9  A    Yes.

10 Q    If you could go back and do things over again, would you

11 have told the police that first time you saw them exactly what

12 you testified to today?

13 A    Yes.

14        MR. COOK:  If I could have just a minute, please,

15 Your Honor?

16        THE COURT:  You may.

17 BY MR. COOK:

18 Q    As I stated, we're going to refer to you as Ms. Doe for

19 purposes of this hearing, and I will just say thank you.  I'm

20 sure Mr. Crawford will have some questions for you.

21        THE COURT:  Thank you.  Mr. Crawford, you may cross

22 examine the witness.

23        MR. CRAWFORD:  Thank you, Your Honor.

24

25

1                    <u>CROSS-EXAMINATION</u>

2    BY MR. CRAWFORD:

3    Q    I'm going to call you Ms. Doe also, okay?

4    A    Yes.

5    Q    Uhmm, you met Samuel on an Internet chat room, right?

6    A    Yes.

7    Q    And the rules at your house were that you were not to be

8    chatting on the Internet with strangers; isn't that right?

9    A    Yes.

10   Q    You didn't even have any Internet access at your house,

11   right; is that true?

12   A    Yes.

13   Q    And certainly if your parents found out you were chatting

14   with someone on the Internet who was a stranger you'd be in

15   trouble?

16   A    Yes.

17   Q    And that's why -- I think you told us just a little

18   earlier that's why you made up this story about being

19   kidnapped by someone off your bike, right?

20   A    Yes.

21   Q    And you told that story to the first policeman you met

22   that day, right?

23   A    Yes.

24   Q    And you told it to your mom, right?

25   A    Yes.

1  Q   And then you told it to the people at Chaucie's Place,
2  right?
3  A   Yes.
4  Q   And all of those things about being grabbed off your bike
5  and taken to a hotel by a stranger, those were all lies,
6  weren't they?
7  A   Yes.
8  Q   And the reason you lied is you didn't want to get in big
9  trouble with your mom and dad, right?
10 A   Yes.
11 Q   If they had found out that you agreed to meet a stranger
12 at a motel and went up to his room, you would have been in way
13 big trouble, wouldn't you?
14 A   Yes.
15 Q   And if they found out you went up to a stranger's room
16 whom you had met in a chat room to have sex, you'd be in super
17 trouble, wouldn't you?
18 A   Yes.
19 Q   You sent this person you knew as Samuel some pictures of
20 yourself on your cell phone, right?
21 A   Yes.
22 Q   And one of the pictures was you -- a picture of you in
23 panties and a bra?
24 A   Yes.
25 Q   Did you tell this man you knew as Samuel that you were a

1 pervert?

2 A   Yes.

3 Q   Did you send him a little drawing or cartoon you had made

4 that you called "Pervert Girl"?

5 A   Yes, because we were acting, and usually whatever I do is

6 really a big joke.

7 Q   I didn't hear the last part, I'm sorry.

8 A   Whenever I draw it's usually something me and him would

9 talk about.  And usually everything I draw is a joke.

10 Q   You thought this person you knew as Samuel, that you met

11 on the Internet, you thought he liked you, right?

12 A   Yes.

13 Q   And I think you told the prosecutor that you were kind of

14 excited to meet up with him, right?

15 A   Yes.

16 Q   And you talked with this man you knew as Samuel about sex,

17 didn't you?

18 A   Yes.

19 Q   Were you kind of curious about sex back in October of last

20 year?

21 A   Yes.

22 Q   You didn't really know too much about it?

23 A   I didn't know anything about it.

24 Q   But you were interested in it, right?

25       You were curious about it?

1 A   Yes.

2 Q   And I think you used this term, Ms. Doe, that when you

3 first talked to your mom about what happened and when you

4 first talked to the police you "over exaggerated," right?

5 A   Yes.

6 Q   Because if you had told the truth you would be in really

7 bad trouble with your parents, right?

8 A   Yes.

9 Q   When you went up to the hotel room you thought there might

10 be some sex involved, didn't you?

11 A   Yes.  So when he came in I told him I didn't want any sex

12 involved.

13 Q   You changed your mind, right?

14 A   Yes, because I knew that anything that happened I would

15 easily regret it.

16 Q   And you would have been in super big trouble with mom and

17 dad, right?

18 A   Yes.  But I didn't want anything happening with something

19 I'll easily regret even if my parents knew.

20           MR. CRAWFORD:  That's all I have, Judge.

21           THE COURT:  Did you have any redirect?

22           MR. COOK:  Just very briefly, Your Honor, if I may.

23                    RECROSS-EXAMINATION

24 BY MR. COOK:

25 Q   Ms. Doe, I just have one or two questions.

1           At the point you're engaging in the chat conversations

2    and sent some pictures to the person who turned out to be

3    Mr. Henzel, what age did you believe him to be?

4    A    Fourteen.

5    Q    When you actually met Mr. Henzel in person, did you want

6    to engage in any sex acts with him?

7    A    No.

8    Q    Did you tell him that you didn't want to engage in sex

9    acts with him?

10   A    Yes.

11   Q    And you told him that multiple times; is that right?

12   A    Yes.

13           MR. COOK:  No further questions, Judge.

14           MR. CRAWFORD:  Nothing further, Your Honor.

15           THE COURT:  I have just a couple of questions for

16   you.

17           When you -- and I know this is kinda hard -- but when

18   you whimpered, can you please tell me -- make that sound for

19   me today that you made that day?  You say you whimpered the

20   first time when he first started touching you on the bed.

21           What kind of sound did you make?

22           THE WITNESS:  You want me to repeat the sound?

23           THE COURT:  Yes, please.

24           THE WITNESS:  I don't know how to make that sound.

25           THE COURT:  Were you crying?  Or tell me what you

1  were doing.

2          THE WITNESS:  Sort of a crying whimper.

3          THE COURT:  And when he tried to penetrate you,

4  tried to put his penis in your vagina, what sound did you

5  make?

6          Was it a sound of pain or what kind of sound?

7          THE WITNESS:  It was like about to breakdown kind of

8  whimper, breakdown and cry.

9          THE COURT:  Okay.  Now, you also told me that you

10  told Sam Henzel at least 10 times you did not want to have

11  sex.

12          Can you tell me exactly what you said to him?

13          THE WITNESS:  I don't want to have any sort of

14  sexual thing happen while I'm here.

15          THE COURT:  And you told him that 10 times?

16          THE WITNESS:  Yes.

17          THE COURT:  And those are the words you used?

18          THE WITNESS:  Yes.

19          THE COURT:  Anything sexual?

20          THE WITNESS:  Yes.

21          THE COURT:  No slang?

22          THE WITNESS:  No slang.

23          THE COURT:  All right.  Any questions on the Court's

24  questions; the government?

25          MR. COOK:  No, Your Honor.

1          THE COURT:  Mr. Crawford?

2          MR. CRAWFORD:  No, Your Honor.

3          THE COURT:  Okay.  Thank you very much.  You can --

4  Tanesa's going to come and unhook you and you can return to

5  your table.

6          We're going to take a restroom break, counsel.

7          Will you have another witness?

8          MR. COOK:  Yes, Detective Pirics.

9          THE COURT:  All right.  We'll take a five minute

10  restroom break and come back and finish up.

11          *(Witness excused.)*

12          THE COURT:  We're in recess.

13          (The Court recessed from 10:15 a.m. to 10:20 a.m.)

14                         (IN OPEN COURT.)

15          THE COURT:  You may be seated.  We're back on the

16  record.

17          Mr. Cook, you may call your next witness.

18          MR. COOK:  Government calls Detective John Pirics.

19          THE COURT:  If you would come up to the witness

20  stand, please.

21           JOHN PIRICS, GOVERNMENT'S WITNESS, SWORN

22          THE COURT:  You may be seated.  Counsel, soon as

23  he's comfortable you may examine your witness.

24          MR. COOK:  Thank you.

25

1    **DIRECT EXAMINATION**

2    BY MR. COOK:

3    Q    Please state your name for the record.

4    A    John Pirics.

5    Q    How do you spell your last name?

6    A    P-i-r-i-c-s.

7    Q    How are you employed, Mr. Pirics?

8    A    I'm a detective with the Carmel Police Department

9    currently assigned to the Hamilton County Child Exploitation

10   Task Force.

11   Q    Are you also cross-designated as a task force officer with

12   Homeland Security Investigations?

13   A    Yes, I am.

14   Q    I want to draw your attention to an investigation

15   involving one Sam Henzel.

16          Do you see Sam Henzel here in the courtroom?

17   A    I do.

18   Q    He's the defendant in these proceedings; is that right?

19   A    That's correct, yes.

20   Q    As part of your duties, do you at times -- for lack of a

21   better term -- adopt investigations that have started with

22   state authorities and then become federal?

23   A    I do, yes.

24   Q    Did you become involved in an investigation involving

25   Mr. Henzel?

1  A    I did.

2  Q    At what point did you become involved in the

3  investigation?

4  A    On October 4th of 2010.

5  Q    We're actually talking about November 4th, correct?

6  A    Yes.

7  Q    Okay.  At the point you became involved, had Mr. Henzel

8  already been arrested by the Westfield Police Department?

9  A    Yes, he had.

10  Q    And held in Hamilton County Jail?

11  A    That's correct.

12  Q    Did you have cause to travel to the Hamilton County Jail

13  and speak with Mr. Henzel?

14  A    I did.

15  Q    Were you accompanied by anyone?

16  A    Yes, Special Agent Michael Johnson with the Department of

17  Homeland Security Investigations.

18  Q    When you went to the Hamilton County Jail, where did you

19  find Mr. Henzel?

20  A    Mr. Henzel was currently occupying a padded cell.

21  Q    Okay.  And did you speak with him and let him know who you

22  were?

23  A    I did, yes.

24  Q    And did you go through with him his rights pursuant to

25  Miranda?

A    Yes, we did.

MR. CRAWFORD:  Judge, at this time I need to make a Jenx Act objection.  I don't have a DEA 6, or 402 report, or report of the interview between this officer and my client.

MR. COOK:  Your Honor, a report was provided to Mr. Henzel's previous counsel.  As the Court's aware, Mr. Crawford was just recently appointed.  I don't know to what degree things were provided, but I can provide him a copy right now.

THE COURT:  Sure.  And if you need a few minutes, Mr. Crawford, we'll give you a few moments.

MR. CRAWFORD:  If I can have a moment, Judge.  This doesn't look familiar.  I have some reports, but this doesn't look familiar.

THE COURT:  Take your time, Mr. Crawford.

(Counsel conferring with defendant.)

MR. CRAWFORD:  Judge, I've had a chance to examine it.  My client, who's reviewed the discovery material, has never seen this.  We've had a chance to see it and we're prepared to proceed.

THE COURT:  Thank you.  You may continue, counsel.

MR. BLACKINGTON:  Thank you, Your Honor.  Just so I'm clear, Mr. Crawford, we're clear to go?

MR. CRAWFORD:  Yes.

1 | BY MR. COOK:

2 | Q   Okay.  Have to remember where we were.

3 |     You spoke with Mr. Henzel and he waived his Miranda
4 | Rights?

5 | A   Yes, he did.

6 | Q   How did Mr. Henzel describe initially meeting the minor
7 | we've been referring to today as Jane Doe?

8 | A   He said he met Ms. Doe chatting on line using IMVU Chat
9 | Service.

10 | Q   And did he state being aware of her age as their
11 | communications progressed?

12 | A   Yes.  He told us he originally believed she was 13 years
13 | old, but at some point she told him that she was 12.

14 | Q   Did he state how he represented his age to Ms. Doe?

15 | A   He said he originally let her believe that he was a 14
16 | year old male.

17 | Q   Okay.  And did he later advise her that he was at least
18 | somewhat older, as he was going to be driving?

19 | A   Yes, he did.

20 | Q   Did he tell you that he ever gave his actual age?

21 | A   No.  He just told us that he let her know he was old
22 | enough to drive.

23 | Q   How did Mr. Henzel describe meeting Ms. Doe actually in
24 | person on October 30th?

25 | A   Uhmm...

1          MR. CRAWFORD:  Judge, I'm going to make an

2   objection.  I'm thinking about Indiana Rule of Evidence 61,

3   recorded interviews (pausing).

4          I don't think that was in effect till January 1 of

5   this year, so I withdraw my objection.

6          THE COURT:  All right.  You may proceed.

7          MR. COOK:  Thank you.

8   BY MR. COOK:

9   Q   How did Mr. Henzel describe his meeting Ms. Doe in person?

10  A   Uhmm, he advised that at some point on the day of the meet

11  she contacted him to let him know that she was having trouble

12  making it to the meet location.

13  Q   Did he advise he then drove to go meet her?

14  A   Yes, that's correct.

15  Q   Did he describe her reaction at all upon her first seeing

16  him?

17  A   Yes.  He said she appeared to be shocked when she first

18  saw him.

19  Q   Did he describe her as being also very nervous?

20  A   Yes.

21         MR. CRAWFORD:  Judge, I object to the leading

22  nature.

23         THE COURT:  I'll sustain the leading.

24  BY MR. COOK:

25  Q   Did he describe any other reaction of hers besides being

1  shocked when she saw him?

2  A    Yes.  I believe he said she appeared to be shocked and

3  nervous, and related that reaction possibly to seeing his real

4  age for the first time.

5  Q    How did they make their way then to the hotel?

6        Did he describe that to you also?

7  A    Yes.  He continued to drive to the hotel with her on her

8  bike behind him.  At some point he thought she was struggling

9  to keep up, so he stopped and had her get in the car with him.

10  Q    When they eventually made it to the hotel room, did

11  Mr. Henzel advise anything that Ms. Doe said to him upon his

12  first entering?

13  A    Uhmm, not that I recall at this point.

14  Q    Okay.  Did he ever tell you about her expressing she

15  didn't want to have sex with him?

16        MR. CRAWFORD:  Objection, he's leading.  Let's let

17  the witness testify.

18        THE COURT:  Would you rephrase the question?

19  BY MR. COOK:

20  Q    Did he describe any statements Ms. Doe made to him about

21  her intention to have sex?

22  A    The statements that he made were more in line with gauging

23  her reactions than hearing actual statements.

24        THE COURT:  So the answer is no?

25        THE WITNESS:  That's correct, ma'am.  Yes, ma'am.

1 BY MR. COOK:

2 Q   Is there anything that might refresh your recollection

3 regarding Mr. Henzel's statements that day?

4 A   Yeah, a copy of my supplement.

5           MR. COOK:  If I may approach the witness, Your

6 Honor?

7           THE COURT:  You may.

8           MR. CRAWFORD:  Your Honor, there's no inference this

9 witness needs his recollection refreshed.

10           THE COURT:  Do you need your recollection refreshed,

11 witness?

12           THE WITNESS:  Uhmm, yes, it would help to have my

13 supplement.

14           THE COURT:  I'm going to let him look at it.

15 A   Yes.

16           THE COURT:  Get your report back.

17 BY MR. COOK:

18 Q   Does that statement refresh your recollection?

19 A   It does, yes.

20 Q   All right.  Did the defendant share any statements that

21 Ms. Doe made to him upon his entering the room?

22 A   Yes, that she was not sure she wanted to have sex with

23 him.

24 Q   Did he state, however, that they ended up engaging in sex

25 acts?

1 A   He advised me they engaged in both oral sex and

2 intercourse, until the point he thought she was in pain at the

3 beginning of their intercourse and he stopped.

4 Q   Okay.  At this point, by November 4th, were you aware of

5 Ms. Doe's claims that there had been a forced sexual

6 encounter?

7 A   Yes.

8 Q   Did you discuss that with Mr. Henzel at all?

9 A   I did.  I advised him that she was under the impression --

10         MR. CRAWFORD:  Objection, Judge.  It's double or

11 triple hearsay.  He's talking about what Ms. Doe said to the

12 detective, I assume what they said to this officer, and

13 there's no establishment that Ms. Doe is a person of

14 credibility.  In fact, the contrary.  There's been evidence in

15 this hearing that she has lied to authorities previously.

16         MR. COOK:  May I respond, Your Honor?

17         THE COURT:  You may.

18         MR. COOK:  Number one, at this sentencing hearing,

19 hearsay is admissible.  Number two, we're talking about

20 statements Mr. Henzel made to Detective Pirics and

21 Mr. Henzel's responses thereto.

22         THE COURT:  I'll overrule the objection.

23 A   I advised Mr. Henzel that Ms. Doe believed that some of

24 these acts occurred against her will.  And several times

25 during the interview he replied to me he could understand why

1 she would feel that way, but that was never his intent.

2 BY MR. COOK:

3 Q    Did he talk about her reactions to him further?

4 A    I'm sorry, the question again?

5 Q    Did he talk further about her reactions to him?

6 A    Uhmm, just general; that she appeared to be scared and

7 nervous during their encounters.

8         MR. COOK:  I don't have any further questions, Your

9 Honor.  Thank you.

10         THE COURT:  You're welcome.

11         MR. CRAWFORD:  No questions, Judge.

12         THE COURT:  Thank you very much.  You may return to

13 your seat.

14         *(Witness excused.)*

15         THE COURT:  Does the government have any other

16 witnesses at this stage of the proceedings?

17         MR. COOK:  No other witnesses at this stage, Your

18 Honor.

19         THE COURT:  Mr. Crawford, any witnesses?

20         MR. CRAWFORD:  No, Your Honor.

21         THE COURT:  All right.  Mr. Crawford, why don't you

22 and your client come back to the podium, to the lectern?  And

23 I'd like to hear your argument on whether or not the

24 government has met their burden by a preponderance of the

25 evidence, and then I'll allow you to respond.

1           MR. CRAWFORD:  May I proceed, Your Honor?

2           THE COURT:  You may.

3           MR. CRAWFORD:  It is our position, Judge, the

4    government hasn't even come close to meeting their argument by

5    a preponderance of the evidence that this defendant used force

6    or the threat of force, pursuant to the definition in United

7    States Sentencing Guidelines Section 2G1.3.

8           Judge, I would ask the Court to delineate and separate

9    out the obviously disgusting, heinous conduct of my client in

10   engaging in sexual acts with a 12 year old girl, use of

11   alcohol, the use of marijuana.  It's just reprehensible to

12   have sexual contact with a girl of that age.  There is no

13   question about that.  But the issue for the Court's decision

14   is whether or not this man used force to commit these sexual

15   acts on Jane Doe, not whether he seduced her into committing

16   these acts by his Internet chats, by his conduct in the hotel

17   room, by his demeanor, by his age difference.

18          Those indeed show evidence of seduction, persuading a

19   child mentally to commit sexual acts about which I think the

20   evidence shows she was ambivalent.  She was sexually curious,

21   which young people often are, and the Internet is a horrible

22   instrument of feeding that curiosity and the weaknesses in

23   human beings when it comes to sexual matters, as Jane Doe's

24   parents tried their best to keep their 12 year old girl from

25   chatting on the Internet with people she didn't know because

1  of the dangers of these kinds of things happening.

2        I really am pushed to have sympathy for parents today

3  of young teens who try to keep their youngsters away from

4  chatting on the Internet with strangers about sexual matters.

5  The curiosity of preteens and young teens with regards to sex

6  is tremendous.  And the avenue for feeding that curiosity by

7  anonymous chats with people on the Internet is great.

8        But the act that occurred between Mr. Henzel and Jane

9  Doe on October 30th of 2010 at the Comfort Suites was a

10  reprehensible act, was an illegal act, but it was not

11  committed by force.  Simply because she had it in her mind

12  that she might not want to do this sex act, and told him that

13  she might not want to do the sex act, does not connote that

14  the sex act that occurred between them was done by force.  He

15  may have persuaded her in a variety of ways that he never

16  should have done, but that's seduction, not force.

17        Let's look at what the commentary to Section 2G1.3

18  says about the force implications.  That section in the

19  commentary, Section 5(B)(i), page 207 of the 2010 edition --

20  which is what we're using of the guideline manual -- says

21  "Conduct described in 18 U.S.C. Section 2241(a) or (b)," which

22  is the cross-reference that gets us to this issue, "is

23  engaging in or causing another person to engage in a sexual

24  act with another person:

25        "I.  Using force against the minor.

1    "II.   Threatening or placing the minor in fear that

2  any person will be subject to death, serious bodily injury or

3  kidnapping.

4    "III.   Rendering the minor unconscious.

5    "IV.   Administering by fear, or threat of force, or

6  without the knowledge or permission of the minor, a drug,

7  intoxicant, or other similar substance, and thereby

8  substantially impairing the ability of the minor to appreciate

9  the sexual conduct -- to appraise the sexual conduct."  And

10  then it gives an example:  "This provision would apply, for

11  example, if any dangerous weapon was used or brandished, or in

12  a case in which the ability of the minor to appreciate or

13  control conduct was substantially --" " -- substantially

14  impaired by drugs or alcohol."

15    Now, that's not exactly a definition of force, but

16  reading that commentary section I think impresses -- should

17  impress the Court with the severity of making this finding a

18  10 level increase in offense level for this defendant.

19    I think what the statute intends, what the guidelines

20  intends rather, is that if the perpetrator in an adult/minor

21  sexual situation uses this kind of force, a gun, a weapon,

22  threatening I'm going to kill you or kill your parents if you

23  don't do this, substantial impairment through alcohol or

24  drugs, that's the degree of force necessary to cause the

25  cross-reference to the criminal sexual abuse statute.  It's a

1 serious substantial amount of force that's necessary, not

2 simply that Jane Doe in this case perhaps changed her mind;

3 was curious about sex acts with this man; perhaps thought she

4 was going to be in a whole lot of trouble with her parents if

5 they ever found out about this; all the things that go through

6 a female's mind, a minor, in this kind of very delicate

7 situation, in a motel room with a man 27 years old.

8         All those things come into effect.  But I didn't hear

9 from her the testimony that he had struck her; pinned her down

10 to the bed by the force of his body weight; kept her on the

11 bed while these things were happening; that he had threatened

12 to hurt her or her family.  I didn't hear that testimony.

13         I heard the testimony of a very embarrassed young

14 woman who indeed was the victim of the depravation of her

15 innocence by this man and that is a serious crime.  But her

16 testimony today was of a young woman sexually curious;

17 probably wanted to do some things; didn't want to do some

18 other things; changed her mind and decided this wasn't

19 something she should be doing, which is why 12 year olds can't

20 make up their minds about sexual conduct.  They're too young.

21 They don't have the wherewithal to do that.  But at the same

22 time she wasn't taken by force.

23         This is an illegal reprehensible act.  It's not a

24 forcible act under that provision of the guidelines, and

25 Mr. Henzel should not be subject to a 10 level enhancement

1  because of that, and that's our basic argument, Judge.

2

3     THE COURT:  Thank you, Mr. Crawford.  You may have a

4  seat.

5        Mr. Brant, if you would come up to the lectern,

6  please.  Your position, counsel?

7        MR. COOK:  Thank you, Your Honor.  The law protects

8  you no matter where you go, no matter what your intent is

9  entering a situation, no matter what you're doing.  The

10 evidence in this case in this sentencing hearing today shows

11 that Ms. Doe and Mr. Henzel met on line, engaged in sexually

12 charged Chats, and that there may have been -- may have been

13 on the part of Ms. Doe some desire to explore that sexuality

14 when she met Mr. Henzel, but she believed him to be a 14 year

15 old boy.  She is allowed to change her mind and she in fact

16 did so.

17       As she testified, and as Mr. Henzel agreed when he was

18 interviewed, among the first things she said when they entered

19 the hotel room, "I do not want to engage in any sexual acts

20 with you."  As Ms. Doe testified, she told him on numerous

21 occasions.  She described it around 10 occasions she did not

22 want it to happen.  She expressed this view nonverbally as

23 well when she cried or whimpered on at least two occasions.

24       She was drawn into a situation where a person who was

25 more than twice her age, roughly two and a half times her age,

1  got her into a hotel room, tried to get her to drink alcohol,

2  got her to ingest marijuana, and then forced himself upon her.

3      The government will acknowledge in fairness to the

4  defense that this is not a case of the proverbial knife

5  wielding maniac jumping out from behind a bush and driving a

6  child off and engaging in sexual acts with them with a knife

7  to the throat.  But that is not the end of what constitutes a

8  forceful sexual encounter.

9      Ms. Doe will was overborn by Mr. Henzel.  Her will was

10  overborn.  She expressed herself that she did not want it to

11  occur.  He pushed the envelope and caused it to occur anyway.

12      Now, there are two things that are occurring here

13  within the guidelines.  First of all, there's the question of:

14  Is there a cross-reference at all to 3A1.1?  And, secondly, is

15  there within that cross-reference, if that does occur, an

16  additional offense characteristic that would apply there?  So

17  the cross-reference itself causes the base offense level to

18  raise by six.

19      And then once into that level, if there was actual

20  force used, Ms. Doe's will was overborn.  Under 3A2.1(b)(1) an

21  additional four levels are added.

22      THE COURT:  Is your will being overborn sufficient

23  to establish force, using force against the minor?

24      MR. COOK:  I think that force does not have to be

25  actually use of a weapon.  That's an example that's pointed to

1  under the application notes.  I am not aware, off the top of
2  my head, of any authority that specifically states that their
3  will being overborn is enough, but a question of what is
4  force.

5         With regarded to -- with regard to the cross-reference
6  itself.  If the Court looks at application 5 back in 2G1.3,
7  application note 5(b)(iii), if there's conduct described in 18
8  U.S.C. Section 2242, the cross-reference which creates the
9  additional base offense level, that can occur separate and
10  apart from the 2241(a) or (b).  Now, that cross-reference
11  still requires that there need to be threats or the act of
12  placing of a minor into fear.  I just raise that for the
13  Court's point of view.  But it's the government's position
14  that this was a forced sexual encounter.

15         I suppose what it would boil down to is this, Judge,
16  and I've used this way of viewing it when describing this case
17  to colleagues:  If you have a way of measuring this by a
18  number, with zero being a consensual encounter like occurs
19  between adults, and 100 being the knife wielding maniac who
20  drags you into the bushes and subjects you to a sexual
21  assault, the question is -- and if we're at a 50 percent -- if
22  it's over 50 it's forceful, under 50 we would consider it not.
23  The question is:  Where does this fall?  And in terms just of
24  the force aspects of this, the government must concede that is
25  a close call.

1     But I would suggest to the Court that the testimony

2 today, Ms. Doe expressing her wishes on 10 occasions,

3 signaling the defendant with her whimpering or crying, does

4 fall over that 50 percent line and fall into force.

5     I think that it's important to note that the defendant

6 himself, when speaking with Detective Pirics, agreed that

7 Ms. Doe could have seen it that way.  Though he did not mean

8 it to be that way, he said he could understand how she seen it

9 that way.  He was there he seen what was going on and he could

10 even see how she might have felt force.  That is significant.

11 So just in terms of how to figure this guideline, I think that

12 cross-reference is important and needs to be heard.

13     If the Court does not elect that cross-reference, I

14 want to note one other point.  The defense filed objection to

15 2G1.3(b)(2) where the offense must involve a knowing

16 misrepresentation of a participant's identity or a participant

17 otherwise unduly influenced a minor to engage in prohibited

18 sexual conduct.  In such a case, two levels are added to the

19 offense level.  If the Court does not make the

20 cross-reference, I think the evidence is very sufficient to

21 apply that:

22     1.  Mr. Henzel presented himself to be a 14 year old;

23 and

24     2.  If the Court looks at the application notes, under

25 application note 3(b), undue influence, there's actually a

1  rebuttable presumption that would apply where one of the

2  participants is 10 years older than the minor.  In this case

3  Mr. Henzel is 18 years older.  I think in either event that

4  would apply, if the Court has not made the cross-reference.

5       In any event, the government does ask for that

6  cross-reference.

7       THE COURT:  What was the cite 224.41(c)?

8       MR. COOK:  The cross-reference occurs -- excuse me,

9  Judge, I've lost my place.

10      THE COURT:  The cross-reference -- the other item

11 that Mr. Marsh and Mr. Marsh objected in their brief --

12      MR. COOK:  2G1.3(b)(2).

13      THE COURT:  Okay.  Thank you.  Did you have any

14 final comment, Mr. Crawford?

15      MR. CRAWFORD:  No, Your Honor.

16      THE COURT:  I need to see my probation officer in my

17 conference room for three minutes.  I'll be right back in.

18      THE CLERK:  All rise.

19      (The Court recessed from 11:10 a.m. to 11:15 a.m.)

20                    (IN OPEN COURT.)

21      THE COURT:  You may be seated.  We are back on the

22 record.

23      Counsel, based upon the presentence investigation

24 report, and the testimony and evidence that's been presented

25 today, the Court finds that the government has not met the

1  burden by a preponderance of the evidence to allow the Court

2  to give the cross-reference.  So the Court is going to find

3  that the base offense level is 24.

4         The Court will add two levels for the specific offense

5  characteristic that the defendant misrepresented his

6  identification.  He pretended to be between 14 and 17 years

7  old when he was actually 29 years of age.

8         The Court will add two levels for the specific offense

9  characteristic, the use of a computer.  And the Court will add

10 two levels for the specific characteristic that the commission

11 of two sexual acts, what the defendant referred to as 69,

12 which is the oral sex, and then the vaginal intercourse, for

13 a -- that would bring our adjusted offense level to 38 -- 30,

14 I'm sorry.

15        The defendant is entitled to a two level reduction for

16 acceptance of responsibility, as he has admitted to the

17 offense and he cooperated and gave a statement immediately

18 following the incident.

19        And does the government have a motion to make

20 regarding the additional point?

21        MR. COOK:  Yes, Your Honor.  The government would

22 move for the additional point recognizing Mr. Henzel, with

23 regard to the charged offense, did enter a plea without --

24        THE COURT:  The Court will add one additional level

25 of reduction because the offense level was at least 16 and the

1  government has made a motion stating that the defendant has

2  cooperated and assisted in the investigation by timely

3  notifying the authorities of his guilt and his intent to enter

4  a plea of guilty, for a total three level reduction, which

5  moves our total offense level to 27.

6        The defendant does have a prior conviction for

7  unlawful possession of drug paraphernalia and possession of

8  cannabis, which is one point.  And the criminal record falls

9  within criminal history category I, and that produces a

10 guideline range of 70 to 87 months.

11       At this point, Mr. Crawford, you and Mr. Henzel may

12 present any information, argument or elocution as you see fit.

13       And the Court would note that it has received one

14 letter from Mr. Henzel's parents -- or father.

15       MR. CRAWFORD:  He would like to -- my client would

16 like to exercise his right of elocution.

17       THE COURT:  You may.

18       THE DEFENDANT:  I just want to say that I'm sorry.

19 But I'm deeply sorry to the victim and her family.  That's it.

20       THE COURT:  Okay.  Thank you.  All right.  You need

21 to stay up there with your lawyer.  He's allowed to make any

22 argument on your behalf.

23       Mr. Crawford, do you have any additional evidence or

24 witnesses?

25       MR. CRAWFORD:  No, Your Honor.  Judge, the range

1 criminal history category I, offense level, what did we come
2 out with ...

3              THE COURT:  Twenty-seven.

4              MR. CRAWFORD:  Seventy to 87 months of
5 incarceration.  We'd ask for the minimum period of
6 incarceration.

7         This young man needs some help to correct a problem.
8 I think the federal government, through the Bureau of Prisons,
9 will provide him an avenue for that help.  He has told me that
10 he knows he has a problem; is that correct?

11             THE DEFENDANT:  Yes.

12             MR. CRAWFORD:  Tell the Judge.

13             THE DEFENDANT:  I do know I have a problem with
14 attraction to younger girls and want help with it.

15             MR. CRAWFORD:  You're willing to get that help?

16             THE DEFENDANT:  Yes.  I never want to do anything
17 like this again.

18             MR. CRAWFORD:  I think the avenue will be open for
19 him, Judge, to take advantage.  If he doesn't, he'll pay the
20 consequences.  There will be substantial periods of supervised
21 release.  We ask less than life I think would be appropriate.

22         This is a terrible tragedy that happened and I feel
23 greatly for the young girl and her family, but this man can
24 benefit from the programs available in the Bureau of Prisons.

25             We ask the Court to sentence accordingly.

1          THE COURT:  All right.  Thank you, Mr. Crawford.
2  Mr. Brant, you may make any -- do you have any additional
3  witnesses or evidence?
4          MR. COOK:  Your Honor, I do have a number of people
5  who would like to make a victim impact statement to the Court.
6          THE COURT:  You may.
7          MR. COOK:  I am not familiar how this Court would
8  like to hear those, if the witness is sworn in or comes to the
9  podium.
10          THE COURT:  We'll have them testify under oath very
11  quick.
12          Who will be your first witness?
13          MR. COOK:  It will be Jane Doe, Your Honor.
14          THE COURT:  Okay.  Come on up, Jane Doe.  Go back
15  over there to Tanesa.
16          You previously had been sworn to tell the truth, so
17  you're still under oath.  So just have a seat and you've got
18  to tell me the truth.
19          You may examine the witness, counsel.
20          MR. COOK:  Thank you.
21      JANE DOE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
22                      DIRECT EXAMINATION
23  BY MR. COOK:
24  Q   As we've done before, I'm going to refer to you as Jane
25  Doe or Ms. Doe.

1        Ms. Doe, as the Court noted, you remain under oath.

2   And again, I'll remind you that you need to make any responses

3   in your microphone.  Actually say them out loud, okay?

4   A    Okay.

5   Q    Do you have anything that you would like the Court to know

6   about how this crime has impacted you and your family?

7   A    Uhmm, this crime has affected me and my family very

8   deeply.  With me, both social and educational ways.  I have

9   not been able to have very good relationships with most boys

10  and still some of my friends.  And this tragedy has made --

11  has made me more distracted in my work and not be able to turn

12  good homework in.  And I've not been able to have as much fun

13  with my friends as I used to.

14  Q    Anything else you would like the Court to know?

15  A    No.

16           MR. COOK:  All right.  No further questions, Your

17  Honor.

18           THE COURT:  You don't have any questions?

19           MR. CRAWFORD:  No questions, Your Honor.

20           THE COURT:  Thank you.  You may return to your seat.

21           *(Witness excused.)*

22           MR. COOK:  Your Honor, the government would call

23  Jane Doe's stepfather.

24           THE COURT:  Sir, if you'd come on up, please.  Raise

25  your right hand, sir.

1    JOHN DOE, GOVERNMENT'S WITNESS, SWORN

2         THE COURT:  You may have a seat.

3         THE WITNESS:  Thank you.

4         MR. COOK:  May I proceed, Your Honor?

5         THE COURT:  You may.

6                 DIRECT EXAMINATION

7

8  BY MR. COOK:

9  Q   Sir, as you're aware, for your daughter's privacy I'll

10 refer to her as Jane Doe.

11        You're Jane Doe's father, correct?

12 A   Correct.

13 Q   Would you please describe to the Court how this crime

14 against your daughter has affected your family?

15 A   Sure.  I typed up something to read, if that's okay.

16        THE COURT:  You may.

17        THE WITNESS:  Thank you.  Excuse me.  I just -- I

18 want to talk to you about my daughter.  Just a moment.

19        The kind of person she is and who she was and the kind

20 of person she is.  Just a second.

21        My daughter came in my life when she was about six

22 years old.  When her mother and I first became -- started

23 dating, we could didn't know we were going to eventually

24 marry, so we were very cautious about introducing me into the

25 children's lives, and we didn't do that until we were sure.

1  We didn't have family things together until we were sure this

2  is -- we were sure this is going to be endearing.  We just

3  always had been very mindful of the emotional needs of our

4  kids, their need for stability and safety and our need to

5  protect them.

6          I got a bike for A.G. before we left California.  It

7  was white and purple, had steamers coming off the handle bars,

8  and she was more cautious than her brother and couldn't take

9  the training wheels off until she had...

10          And after my wife and I married we moved to Indiana.

11  We picked Carmel because it was a safe place with great

12  schools, a good family environment, good place for our kids.

13          My daughter didn't call -- or either of my older

14  children didn't call me dad in the very beginning and that was

15  a little sad for me.  But, you know, they have to take their

16  time.  In other words, it's something we couldn't rush.  A

17  child has to learn to trust and love and be loved.  So I told

18  them they could, you know, call me whatever they liked and

19  whatever was comfortable for them.

20          A.G. has always been a sweet girl.  I remember how

21  proud she was of herself and the joy when we finally did take

22  the training wheels off her bike.  You know, little things

23  fathers and daughters do.

24          One day, without much of ceremony or acknowledgment, I

25  just became dad.  She's always been a naive, shy little girl,

1    perhaps a little awkward at times, as we all were.

2           When we first came out to Indiana she was about six.
3    We bought a mini van with radio controls in the steering
4    wheel, something she had never seen before, and I had her
5    convinced that I could control the radio with my mind by
6    concentrating, raising and lowering the volume.  She's very
7    sweet, very trusting.

8           When she was eight she was sitting in the backyard
9    with some friends and took the dare to leap off our deck onto
10   the grass.  It was about 12 feet.  When she landed she broke
11   her foot.  Spent about eight weeks in a cast.  And that's the
12   real challenge with kids is they just don't have the capacity
13   or the experience to make those kind of decisions.  They
14   underestimate the risk, they can't foresee the consequences
15   and underestimate their ability to control the situation.

16          I was at work when she broke her foot and I met my
17   family at the hospital ER.  And despite the discomfort and
18   pain she was in, she was more worried about telling me what
19   happened, about disappointing me and I think, in her head,
20   being worried she'd be losing my love.  That's another thing
21   about kids.  They just don't under -- or think they can
22   somehow lose a parent's love.  She just can't understand that
23   I'll love her forever no matter what.

24          I'm sorry.  My 12 year old daughter -- or by the time
25   she was 12 still very much the daughter we raised.  She moved

on from Pokey Man cards and now liked animated cartoons. She played Nintendo and the Dance Dance game. She's a kid. She dressed up in costumes of these animated characters and spent hours drawing different cartoon figures with animals, foxtails and ears.

When she was victimized, she was hurt in a way that I can only begin to understand. At the police station she sat on my lap. She needed my security and my safety. But the following days I couldn't even hug her. I couldn't stroke her hair as my own daughter. And the slightest contact made her stiffen and bristle. Her safe world was taken from her. She had nightmares. She was scared of strangers and anyone bearing any resemblance to her attacker.

It's a difficult thing for her to talk about. It's difficult for me. She goes to therapy and group sessions, you know, to help her process. And it's something she tries to bury and forget. I really wish that she could.

I -- that's what makes this crime so evil, that it's an enduring crime. It's something she'll carry with her forever. It will taint all her relationships. It will tear at her and be in her mind when she has her first real boyfriend. She'll have to discuss it with her fiance in 10 or 20 years from now. It will be in her mind when she marries. I hope, but I don't believe she'll ever get it completely out of her head.

1    I mean, even the counseling is something I wish she

2 didn't have to go through.  She's just a kid.  The attack, you

3 know, the examination in the hospital, discussions with the

4 police, as good as they've been, even being here today, these

5 are all things a child should never have to experience.

6    I think some part of her will always blame herself and

7 maybe think she is less worthy of love.  Now I will do

8 everything that I can to let my daughter know that her love

9 can never be diminished.  None of this is her fault.  She was

10 and is a child, my child.

11    Any other crime there may be a reasonable mitigating

12 circumstance, but this absolute -- I mean, there's no scenario

13 in which abusing a child is anything other than evil.  And to

14 my mind tricking or enticing, coercing a child to gain access

15 is even more repugnant because it makes the child feel perhaps

16 more complicit in their own abuse.

17    I guess my last thought I'd ask that, by means of

18 sentencing, please reinforce to my daughter this is not her

19 fault.  Tell her that this is a dangerous, evil man; that he's

20 solely responsible; and let her know that she'll be safe.

21    That's all I have.

22    MR. COOK:  Thank you, Your Honor.  I don't have any

23 questions.

24    THE COURT:  Any questions, Mr. Crawford?

25    MR. COOK:  No questions, Your Honor.

1      THE COURT:  Thank you very much, sir.

2      *(Witness excused.)*

3      THE COURT:  Any other witnesses?

4      MR. COOK:  No other witnesses, Your Honor.  I'd have

5  some argument, if the Court will hear it.

6      THE COURT:  The Court will hear your argument.

7      MR. BLACKINGTON:  First of all, I do want to

8  respectfully note the government's objections to the Court's

9  finding of not making the cross-reference and I'll just leave

10  it at that.  Thank you, Your Honor.

11      Regarding argument on sentencing here.  It's not

12  frequently that I find myself in the circumstances of arguing

13  that the guidelines, as they do here, vastly, vastly underrate

14  the seriousness of this offense.  I want to point the Court to

15  the specific offense characteristics that are actually in

16  application here and just point out how woefully those fail to

17  recognize some of the significant aspects of this offense.

18      There's a two level enhancement for misrepresenting of

19  the age.  I suppose that's appropriate.  It does account for

20  the fact that Mr. Henzel said he was 14 in a way to entice

21  Jane Doe to leave the safety of her home, to get on her bike

22  and make her way out to meet him.

23      Use of a computer to persuade or entice her.  There's

24  two levels there and two levels for a sex act.

25      What is missing from these specific offense

characteristics is an awful lot.  What's missing is the fact
that this victim is only 12 years old.  The offense level in
this case would be exactly as it is were she a 17 year old
fully consenting –– albeit still a minor, but fully consenting
person.  In fact, she was 12.  That should count for something
and doesn't make it into the offense level calculation.

Jane Doe found herself in a hotel with a man who gave
her a drink with some kind of alcohol mixed into it.  Now, had
she ingested enough that she was, I suppose for lack of a
better term drunk, or unable to apprize her condition, the
offense guidelines would capture that.  But it's not captured
at all that he attempted to give her an alcoholic beverage and
that should count for something quite a bit.

What's also not captured at all is that an illegal
substance was at least pressured upon her, that Mr. Henzel
blew into her face, that he got her to smoke and coughed out
of her 12 year old lungs.  That's left out of the guidelines
also.

Finally, while I respect the Court's decision not to
make the cross-reference, I think that one would have to agree
that this was something less than a consensual encounter.
This was at least a significantly pressured sexual situation.
She told Mr. Henzel 10 times that she's not wanting to engage
in any sex acts with him.  She tried to be less than helpful
as he took her clothes off.  She tried to express her desire

1  not to go by making whimpering sounds.

2          Now, it may require more to make the cross-reference,
3  but that should still count for something.  Under the current
4  offense level it's not counted at all.

5          The Court's aware that the guidelines are not the end
6  of the story when crafting a sentence.  They are just the
7  beginning.  They are just advisory.  We also look at 18 U.S.C.
8  3553(a); look at the seriousness of the offense; history and
9  characteristics of the defendant; the kind of harm that he has
10 done upon the victim, upon her family and upon our community.

11         Judge, the guideline range of 70 to 87 months does not
12 begin to capture what occurred here.  That advice from the
13 Sentencing Commission is, with all due respect, wrong and
14 insufficient to meet the sentencing factors of 3553(a).

15         Mr. Henzel traveled from Chicago, Illinois after
16 misrepresenting himself to be a 14 year old boy to get a girl
17 to leave her family behind for the afternoon to come and meet
18 her.  He talked about sex on the Internet and he got her out
19 of her house.  He tricked her by saying he was 14 years old
20 and possibly as old as 16 or 17.  And was able to drive --
21 came across state lines.  He drove hours.  His sexual interest
22 in children, this child, was such that he drove, what, a four
23 or five hour drive at least from Chicago to Westfield.

24         What did he do for those four or five hours?  Did he
25 think about, plan about how this was going to happen?  Did he

1  think about, plan about that he was going to meet a 12 year

2  old girl that he knew that he was going to engage in sex acts

3  with her?  He had plenty of time to turn around.  He had

4  plenty of time not to ply her with alcohol and marijuana.  He

5  had plenty of time to make a different decision rather than

6  commit the serious reprehensible offense he committed here.

7         What can the Court do to address this kind of offense?

8  What can the court do to try to make things as right as the

9  Court can with what it has in its power?  This is my

10  suggestion, Your Honor -- and I'm well aware of what I'm

11  asking for is a significant upward departure from the

12  guidelines.

13         I'm asking for not less than 120 months imprisonment,

14  10 years.  There needs to be a message to Mr. Henzel, to the

15  community of those individuals who have sexual interest in

16  children such that they would travel great distances to meet

17  for sex.  There needs to be a message this will not be

18  tolerated.  The community needs to be protected specifically

19  from Mr. Henzel.

20         I also request that the Court assess a lifetime period

21  of supervised release.  Mr. Henzel has demonstrated that he is

22  quite willing to follow through on his sexual interest in

23  children.  He's quite willing to travel a great distance and

24  at least pressure, if not force a child into sexual acts.

25  That is significant.  That needs to be addressed by long term

1 lifetime supervised release.

2      Regarding any sort of fine or restitution.  We've been
3 given no restitution request by the victim.

4      Regarding the fine.  The government will defer to the
5 Court.

6      I thank you for your time.

7      THE COURT:  Thank you.  Mr. Crawford, if you and
8 Mr. Henzel will return to the lectern.

9      At this point the Court is prepared to state what the
10 sentence in this case will be.  And, counsel, you will each
11 have an opportunity to state any legal objections before
12 sentence is finally imposed.

13      Pursuant to the Sentencing Reform Act of 1984, it is
14 the judgment of the Court that the defendant Samuel T. Henzel
15 is hereby committed to the custody of the Bureau of Prisons to
16 be imprisoned for a term of 135 months.

17      The Court is issuing a variance from guideline range
18 and the Court will state the reasons for that in just a
19 moment.

20      This sentence indicates the seriousness of the
21 offense; addresses the defendant's personal characteristics;
22 protects society from the defendant's future crimes; and
23 promotes deterrence in the defendant and others.

24      The defendant shall pay to the United States a fine of
25 $5,000.  The Court is departing from the fine guideline range

1  based on the defendant's financial resources and future
2  ability to pay.

3      The Court finds the defendant does not have the
4  ability to pay interest and waives the interest requirement.

5      The defendant shall notify the Probation Department of
6  any material change in economic circumstance that might affect
7  his ability to pay the fine.

8      The defendant shall forfeit a cell phone containing
9  text messages from Jane Doe.

10     Upon release from imprisonment, the defendant shall be
11 placed on supervised release for a term of life.

12     Within 72 hours of release from the custody of the
13 Bureau of Prisons, the defendant shall report in person to the
14 probation department in the district to which he is released.

15     While on supervised release, the defendant shall not
16 commit another federal, state or local crime; shall not
17 possess a firearm, ammunition, destructive device, or any
18 other dangerous weapon; shall cooperate with the collection of
19 a DNA sample; shall refrain from any unlawful use of a
20 controlled substance; and shall submit to one drug test within
21 15 days of placement on supervised release and two periodic
22 tests thereafter, as directed by the probation officer.

23     Further, the defendant shall comply with the standard
24 conditions as adopted by the Judicial Conference of the United
25 States, as well as the following additional conditions:

1          The defendant shall pay any fine that is imposed by

2   this judgment, and that remains unpaid, at the commencement of

3   the term of supervised release.

4          The defendant shall provide the probation officer

5   access to any requested financial information.

6          The defendant shall not incur new credit charges or

7   open additional lines of credit without the approval of the

8   probation officer.

9          The defendant shall participate in a program of

10  testing for substance abuse, to include no more than eight

11  drug tests per month, and shall pay a portion of the fees of

12  testing.

13         The defendant shall submit to the search, with the

14  assistance of other law enforcement as necessary, of his

15  person, vehicle, office, residence and property, including

16  computer systems and peripheral devices.

17         The defendant shall submit to seizure of contraband

18  found.

19         The defendant shall warn other occupants that his

20  premises may be subject to searches.

21         The defendant shall not possess or use a computer

22  unless he agrees to comply with the computer restrictions and

23  monitoring program at the discretion of the probation officer.

24  Monitoring will occur on a random or regular basis.

25         The defendant shall advise the probation officer of

all computers available to him for use. Any computer or
Internet enabled device the defendant is found to have used
and has not disclosed shall be considered contraband and may
be confiscated by the probation officer.

The defendant shall warn other occupants of the
existence of the monitoring software placed on his computer.

The defendant shall not possess any erotica,
pornography other exact pro pack any such material found in
the defendant's possession shall be considered contraband and
may be confiscated by the probation officer.

The defendant shall participate in a program of
treatment for sexual disorders, including periodic polygraph
examinations, as directed by the probation officer.

The Court authorizes the release of the presentence
report and available psychological evaluations to the mental
health provider, as approved by the probation officer.

The defendant shall not have any unsupervised contact
with any minor children, unless the contact has been disclosed
to and approved by the probation officer. In determining
whether to approve such contacts involving members of the
defendant's family, the probation officer shall determine that
the defendant has notified the persons having custody of any
such minors about his conviction in this case and the fact
that he is under supervision. If this notification has been
made, and the person having custody consents to the contact,

1    then this condition is not intended to prevent approval of the

2    contact.

3         The defendant shall register as a sex offender with

4    the appropriate authorities of any state in which he resides,

5    is employed or attends school.

6         The defendant shall pay to the United States of

7    America a special assessment of $100.  Payment of the fine and

8    special assessment shall be due immediately and is to be paid

9    directly to the Clerk, United States District Court.

10        The sentence that the Court intends to impose in this

11   case is at the high end of the -- for the variance made by the

12   Court.  The Court is going to make a variance of five levels

13   under 3553(a) considering the nature and circumstance of the

14   offense.  This was a -- I'm sorry, that's four levels.  Four

15   levels, which would put us in a range of 108 to 135 months.

16        This was a reprehensible offense.  The child was 12

17   years old.  While the Court did not find she was forced to

18   commit these acts, she was certainly -- as Mr. Crawford

19   conceded -- seduced, coerced, persuaded, and tricked to engage

20   in these elicit acts, in part due to her being an innocent 12

21   year old child.

22        Mr. Henzel gave her alcohol, Red Bull drink, and

23   marijuana, which he had smoked in a bong or glass pipe and

24   blew marijuana smoke into her mouth.  Mr. Henzel is solely

25   responsible.

1    The Court finds him to be a dangerous man who preyed

2  on a young girl and took away her innocence.  The child, while

3  she did not -- while the Court did not find she was forced to

4  commit the acts, she testified she crossed her legs,

5  whimpered, told Mr. Henzel at least 10 times she did not want

6  to engage in sexual acts; however, Mr. Henzel continued to

7  persuade this child to engage in this conduct.

8    Mr. Henzel admits that he has a sexual attraction to

9  children.  He is selfish, self-gratifying individual who did

10  not care about the fact that he inflicted a great deal of pain

11  on this child as he satisfied his own sexual desires.  He

12  tricked a 12 year old girl into meeting him by pretending to

13  be originally a 14 year old boy, then later pretended to be

14  17, just old enough to drive.

15    He proceeded to steal her innocence, and when she did

16  not reciprocate his attention, he indicated to the officer in

17  his statement he was confused.  It never entered his head the

18  damage he was causing the child or how inexperienced or young

19  she was.  That becomes more obvious given the fact that Jane

20  Doe did tell him at least 10 times she did not want to engage

21  in this conduct, and he continued through to penetration

22  without regard for her wellbeing.

23    He was substantially older than the victim and used

24  this advantage to manipulate her and desecrate her innocence

25  to gratifying himself.

1       Mr. Henzel is 29 years old.  His work history is

2   minimal.  It appears the defendant is unemployed more

3   consistently than he is employed.  This forces the defendant's

4   parents to take care of him when he's an adult and instead

5   should be supporting himself.

6       In addition, the defendant has used marijuana

7   extensively for several years, which has cost him at least one

8   job.  He indicated to the probation officer he smokes more

9   marijuana than anyone he knows.  All of this is indicative of

10  the defendant's lack of maturity and resistence to grow up and

11  take responsibility for his own life.

12      The fact the defendant wanted treatment would have

13  been commendable if he sought to approval of wrecking a 12

14  year old girl's life.  In addition, he stated he wants

15  treatment to better himself, which is a valid reason.

16  However, if he followed through with the treatment his parents

17  tried to get for him he may not be at this point now.  For

18  some PERIOD.  Get.  Defendant stating crime such as the

19  instant offense they deserve little leniency under the law.

20      A sentence of 135 months is reasonable because it

21  addresses the seriousness of the offense, addresses the

22  defendant's personal characteristics, protects society from

23  the defendant's future crimes and promotes deterrence in the

24  defendant and others who might be tempted to commit these

25  types of similar crimes.

1          The Court is doing a departure on the fine by issuing

2   a $5,000 fine.  It's a departure from the guideline range, as

3   the defendant does not appear to be financially able to pay

4   anymore than that.

5          To date, the victim in this offense has not sought

6   restitution.  The criminal fine payments are deposited in a

7   fund which aids crime victims throughout the country,

8   including victims of sexual offenses.  This will allow the

9   defendant to make reparation for his crime by helping others

10  in their time of need.  That's the reason the Court is

11  imposing the fine, to benefit victims of future crimes.

12         The defendant shall forfeit a cell phone containing

13  text messages from Jane Doe.

14         A term of lifetime supervised release is appropriate

15  to allow the probation office to help the defendant live a law

16  abiding lifestyle and to ensure he does not slip back into his

17  sexual deviate habits.

18         In addition to the standard conditions of supervision,

19  the special conditions are needed to help ensure the safety of

20  the community.  The Court has included in those conditions he

21  have no contact with minor children unless approved by

22  probation.

23         He shall participate in a sex offender treatment in

24  order to protect the community and to help the defendant with

25  his personal and mental health issues, which he's indicated he

1 wants help with.

2        Should he own or use a computer, the defendant is

3 required to participate in the computer monitoring program

4 facilitated by the probation office.

5        The defendant is required by law to register as a sex

6 offender in the state of residence, employment or school.

7        And Mr. Henzel may not possess pornography or erotica

8 based undermines sex treatment and temptation for the

9 defendant to reoffend.

10        Search and seizure on a regular basis will assist the

11 probation office in monitoring the defendant's compliance with

12 his supervised release conditions.  Restrictions condition of

13 financial restrictions and disclosure will help the probation

14 office ensure the defendant is paying the maximum amount

15 available toward any fine balance.

16        The defendant, by his own admissions that he smokes

17 more marijuana than anyone he knows, should be subject to

18 substance abuse testing given his drug history.

19        And those are the reasons for the Court's sentence.

20        Counsel, the Court intends to impose the stated

21 sentence.  Are there any reasons, other than those already

22 argued, why sentence should not be imposed as stated?  And let

23 me start with the government.

24        MR. COOK:  No, Your Honor.

25        THE COURT:  Mr. Crawford?

1    MR. CRAWFORD:  Judge, I want the record to note our

2  objection to the four level enhancement and subsequent 135

3  month sentence as being unreasonable under the statute and

4  sentencing in 3553.  We need that, otherwise no objections.

5    THE COURT:  All right.  Mr. Henzel, the Court now

6  orders the sentence imposed on defendant Robert Henzel as

7  stated.

8    Mr. Henzel, you do have a right to appeal your

9  conviction, if you believe your plea of guilty was somehow

10  unlawful or involuntary, or if there is some other fundamental

11  defect in the proceedings.

12    You also have the right to appeal the sentence imposed

13  by the Court today.  And you have a right to appeal your

14  sentence if you think it's contrary to law.  With few

15  exceptions, any Notice of Appeal must be filed within 14 days

16  after written judgment is entered in your case.

17    If you cannot afford the filing fee or to pay a lawyer

18  to appeal for you, the Court will appoint a lawyer to

19  represent you in the appeal.  If you intend to appeal and tell

20  me now, the Clerk of the Court will prepare a Notice of Appeal

21  for you immediately, or Mr. Crawford can file a written notice

22  within 14 days on your behalf.

23    MR. CRAWFORD:  I'll assume responsibility as a CJA

24  counsel to file a Notice of Appeal on Mr. Henzel's behalf.

25    THE COURT:  Thank you.  Mr. Cook, any other matters

1  to take up for the government?

2          MR. COOK:  Nothing from the government Your Honor.

3          THE COURT:  Any other matters, Mr. Crawford?

4          MR. CRAWFORD:  No, Your Honor.

5          THE COURT:  The Court will recommend that he go to a

6  Bureau of Prisons facility where he can get sexual offender

7  treatment while he's incarcerated.

8          The defendant is now remanded to the custody of the

9  United States Marshal and this case is adjourned.

10          MR. CRAWFORD:  Thank you, Judge.

11          THE CLERK:  All rise.

12                  (Court adjourned at 12:05 p.m.)

13                        *    *    *

14                  CERTIFICATE OF COURT REPORTER

15

16    I, Fred Pratt, hereby certify that the foregoing is a true

17  and correct transcript from reported proceedings in the

18  above-entitled matter.

19

20

21

22    S/FRED PRATT                        July 8 , 2011
       FRED PRATT, CSR
23     Official Court Reporter
       Southern District of Indiana
24     Indianapolis Division

25